# APPENDIX

# Table of Contents

EXH 1 -- Dale Davneport's Declaration                                    3

EXH 2 -- Joint Report on Nuisance Law Abuse                              9

EXH 3 -- Public Improvement District                                    49

EXH 4 -- Hip Hop Government Inc.                                         51

EXH 5 -- Overtime Police Security Emails                                57

EXH 6 -- Dallas City Council Item 57                                    60

EXH 7 -- Temporary Injunction Against Davenport                         63

EXH 8 -- TRO                                                            68

# EXHIBIT 1

## Declaration (28 U.S.C.S. § 1746)

"My name is Dale Davenport, and I declare under penalty of perjury under the laws of the United States of America that the following is true and correct."

1. I co-own Jim's CarWash ("car wash") with my father Freddy Davenport. The car wash is a commercial car wash located at 2702 Martin Luther King, Jr., Blvd, a few blocks from Dallas Fair Park. My father, Freddy Davenport, purchased the property in 1993 and invested more than $250,000, making improvements to it.

2. Since purchasing the car wash, my father and I have had to ward off continuous subtle and not-so-subtle suggestions to buy peace by paying off the politically connected. Our resistance has been met with allegations of criminal activity by council members who ignore significant illegal activity nearby.

3. In 2001, members of the city's nuisance abatement program SAFE (Support Abatement Forfeiture Enforcement) contacted my father and I to inform us that there was recurring dmg activity at the car wash. Freddy Davenport suggested that police conduct a sting operation on the property and offered to cooperate. Representatives of SAFE disregarded the suggestion.

4. In 2002, we witnessed a Dallas Police Department ("DPD") officer using mace on a man in the car wash parking lot. The officer later falsely accused the man of resisting arrest. I appeared as a witness of the event in the man's court hearing, testifying that the man had not resisted arrest. On the day following my testimony, someone shot a bullet through the window of my home. The man accused of resisting arrest was eventually acquitted of the charge, thanks in part to my testimony. On the day of the acquittal, 17 DPD vehicles and 26 officers blocked the driveway of our car wash, rendering it inaccessible to customers. The Dallas Police Department's Internal Affairs refused to take a report of the incident.

5. Dallas police Chief David Kunkle, testifying under oath, confirmed my testimony regarding the gunshot to my residence. He told the Texas House Committee in Austin in April 2005 that the FBI informed him that they had investigated the case and found that someone had fired a shot through my house on the night in question.

6. In 2003, the City of Dallas filed for a Temporary Restraining Order against Jim's Carwash. The Injunction was later made permanent. I attended an Accord meeting with city representatives where I was told that I needed to improve the safety and security of my property. I advanced the possibility of purchasing and installing cameras at the car wash to both monitor and deter any criminal activity on the property.

7. Dallas city representatives insisted that cameras would be insufficient and requested that I hire a guard service. I hired two armed guards to patrol my property. Two weeks following the Accord meeting, I was informed that the city was dissatisfied with my efforts and that the two guards were insufficient.

8. In 2004, the City of Dallas filed a Petition pursuant to Chapter 125 of the Texas Civil Practice and Remedies Code alleging that Jim's Car Wash was a magnet for crime in the area. On November 19, 2004, following an evidentiary hearing in which the City used my

Declaration of Dale Davenport                                                    Page 1

own 911 calls for help against me, the Court entered a Permanent Injunction against Jim's Car Wash. The Permanent Injunction required in part that Jim's Car Wash install and maintain fencing around the property and hire security guards to patrol the property for a minimum of 42 hours per week.

9. This treatment, which was inconsistent with the treatment of neighboring businesses, and the use of my 911 calls as evidence against me ultimately became part of a larger investigation by the Texas State Legislature. The City of Dallas's treatment of me then is not too far afield from the treatment I am experiencing now.

10. In October of 2005, as part of an investigation for the Texas State Legislature, a public hearing of testimony was held by a Joint Committee comprising the House Committee on Criminal Jurisprudence and the House General Investigating and Ethics Committee. My attorney and I gave testimony at the hearing. In January of 2006, the Joint Committee submitted their Report to the Texas House of Representatives ("Report"). It concluded that the campaign against me had exposed ongoing city-wide shakedown efforts by Dallas City Hall.

11. The March 2006, "Report on Joint Interim Study Charge to the 80th Texas Legislature" by the Committee on Criminal Jurisprudence & General Investigating and Ethics Committee" reported an instance when Andy Segal, an attorney with the South Dallas Business Association, informed me that then-Councilman Chaney was displeased "with his commitments to the community" and advised me to make a donation to the African American Book Fair, a project of Chaney's. Davenport complied, donating $500 to the Fair.

12. In 2005 Davenport approached Councilman Chaney about the injunction on my business. Councilman Chaney suggested that I hire Nation of Islam or JL Security, the latter owned by Councilman Fantroy, for my security service needs. Sixty percent of my revenue was spent on guard service required by the SAFE Team. As part of the injunction placed against my business, I was required to comply with all provisions of the judge's order for one year.

13. In 2013, I received a letter threatening the use of eminent domain to seize the car wash property. The letter stated, "As you are probably aware, the City of Dallas is planning improvements to Martin Luther King, Jr. Boulevard and median. Plans have progressed to the point that we wish to advise you that your property described above will be needed for the project." I consulted Lou Jones, the city employee who signed the letter, and could never definitively determine who had authorized the letter.

14. Again in 2013, I spoke to the same Ms. Jones about a property that bordered my own. I asked about the possibility of purchasing the property, which was vacant, to which Ms. Jones responded that the city would not sell it to "people like you."

15. Over the years, I have cooperated with police at every opportunity, even installing video surveillance to which the police have access.

16. In 2001, the Dallas City Council created Planned Development District 595, also known as the South Dallas/Fair Park Special Purpose District ("PDD 595"). Jim's Car Wash was located in an area that was zoned to be a Community Commercial ("CC") sub-district, and

Declaration of Dale Davenport                                                                 Page 2

as described at Article 595, Sec. 51P-595.113, car washes were allowed, with the caveat that a "Site Plan Review" is required before any new work permit may be issued, in accordance with zoning regulation 51A-4.800. Development Impact Review. This zoning change meant that the car wash could continue to exist as it was, but would be required to obtain additional approval from the zoning director before making any changes that required a work permit. The director could, under this process, force me to provide a site plan that contains "any other reasonable and pertinent information that the director determines to be necessary for site plan review" under Dallas Ordinance § 51A-4.803(D)(1)(R).

17. PDD 595 was created in part to make funds available for security and authorized a special tax on property owners within its boundaries to improve the area. I have paid the PDD tax for years.

18. Because my business was spending more on anti-crime measures than most others in PDD 595, I requested assistance with the expense, as is common for such funds.

19. I was surprised to learn that no money was available for any tax-paying stakeholder, because the funds were squandered on a contracting entity, Hip Hop Government, Inc., operated by Jeremy "Jay" Scroggins.

20. Although the State of Texas determined that there were grounds for forfeiture and gave notice of such forfeiture on January 26, 2018, I believe that Hip Hop Government, Inc. lost its charter because its Certificate of Formation stated it was a non-profit entity, though the corporation was never granted such status. Scroggins filed an amendment to his Certificate of Formation in 2013 that changed its purpose from "voting drive organizers" to charitable purposes.

21. To the best of my knowledge, the last public information report was filed by Mr. Scroggins was in July 2014, though organizations are generally required to file such a report annually.

22. Thus, although the PDD received more than $100,000 in its account in 2017 alone, there was no money available for me, or for anyone else, due to the funds paid to Scroggins and non-entity Hip Hop Government, Inc. which apparently understood its job was to pay Scroggins and little else.

23. About 2012, various businesses surrounding Jim's Car Wash on MLK Boulevard began receiving grant money from the City for new facades. Notably, I had not received any funds, nor been made aware they were available for MLK Boulevard businesses. Since I knew other business owners in the area quite well, I found out from them that The Emerald City/Blackjack Pizza building reportedly received $20,000.00 for a new façade and Freedom Fashion, a business on the other side of the car wash, received more than $20,000. Many other businesses also received grant money to make improvements. When I called economic development inquiring about grant money for my car wash, Dallas personnel Venus Cobb stated the was unable to find my address to which they could send an application, though they had no difficulty sending other, less welcome letters such as those threatening eminent domain. When I confronted her about these facts, she immediately changed her reasoning to stating that no more funds were available.

Declaration of Dale Davenport

Page 3

24. In 2012, members of the City Council of Dallas amended PDD 595. The agenda for the December 12, 2012 council meeting annotated to summarize the results of the discussion included this description:

> 68. A public hearing to receive comments regarding a City Plan Commission authorized hearing to consider amendments to Planned Development District 595, the South Dallas/Fair Park Special Purpose District, amending the standards for certain uses, considering appropriate zoning on certain parcels currently zoned for multifamily and non-residential uses, adding a new single family district classification and new mixed use form district classifications on property zoned Planned Development District No. 595 and an NS(A) Neighborhood Service District generally bound by the Union Pacific (DART) Railroad, the Southern Pacific Railroad, C.F. Hawn Freeway, the D.P.&L. Company easement, Central Expressway (S.M. Wright Freeway), the Southern Pacific Railroad, the Santa Fe Railroad, R.L. Thornton Freeway, 2nd Avenue, Parry Avenue, Robert B. Cullum Boulevard, Fitzhugh Avenue, Gaisford Street, and the common line between City Blocks 1820 and D/1821; an ordinance granting amendments to Planned Development District No. 595; an ordinance granting a change of zoning from an MF-2(A) Multifamily subdistrict, an NC Neighborhood Commercial subdistrict and a CC Community Commercial subdistrict to an FWMU-3 Form Walkable Mixed Use subdistrict on property generally bounded by Good Latimer Expressway, Julius Schepps Freeway (I-45), Pennsylvania Avenue, Lamar Boulevard and Grand Avenue with a SF Shop Front overlay on properties fronting Martin Luther King Boulevard and Lamar Street and certain properties fronting Ervay Street and Colonial Avenue, granting a change of zoning from an RS-I Regional Service Industrial subdistrict to an FWMU-3 Form Walkable Mixed Use subdistrict on property on the south corner of Coombs Street and Harwood Street, and granting a change of zoning from an MF-2(A) Multifamily subdistrict to an FWMU-3 Walkable Mixed Use subdistrict on property located on the northeast corner of the S.M. Wright Freeway (US-175) and Hatcher Street; and an ordinance granting a change in zoning from an NS(A) Neighborhood Service District to an NC Neighborhood Commercial subdistrict within Planned Development No. 595 on properties located on the west and south corners of Spring Avenue and Foreman Street
> Recommendation of Staff and CPC:  Approval
> Z101-277(CG)
> **[12-3031; HEARING CLOSED; CPC RECOMMENDATION FOLLOWED; ORDINANCES 28860, 28861 AND 28862]**

25. As indicated by the annotated agenda section copied above, the members of the Dallas City Council approved the proposed changes reflected in Ordinances 28660, 28861, and 28862. During this time, the minutes of the meeting reflect that Councilmember Carolyn Davis had a conflict of interest and left the council chambers during the discussion of this proposal.

26. The effective change to the zoning rules that occurred in the above resolutions eliminated car washes as an allowed business in PDD 595, though no document on the agenda hinted at this change. Jim's Car Wash became a non-conforming use under the Dallas zoning laws, though I was not provided any substantive notice.

27. In mid-2018, while Dallas was struggling with its budget, the Dallas police offered overtime to officers to patrol Jim's Car Wash on May 28, 2018. The email distributed to the police force states: "Southeast Patrol Division has City Overtime or Compensation Time available for all ranks on Monday, May 28, 2018. The hours are from 2pm–10 pm. Overtime will cover South Dallas (Rochester Park and the MLK car wash)." Ex. 8.

28. Despite supportive public statements by leaders of the Dallas Police Association and police officers who patrol the area surrounding Jim's Car Wash that my father and I have worked with the police to fulfill the promises and expectations they expect of a business owner, members of the Dallas City Council signed a request for the Dallas City Council to enforce the regulations of PD 595 on the car wash, meaning it would have to close.

29. In 2018, 1 was told by a third party that my car wash was a nonconforming use under the zoning laws, but I could not determine how or when the zoning rules had been changed until I hired counsel.

30. In 2018, while former Dallas City Council Member Carolyn Davis was at Blackjack Pizza, speaking to its owner about new plans for MLK Blvd, I overheard her say, "We're going to get rid of that cracker head" while talking about plans for my car wash property. When she was told, "The owner of the car wash is standing behind you," she covered her face and ran out of the building. I followed and tried to speak to her, but she got into her car and drove off.

31. From the beginning of 2019 to the end of July 2019, there had been approximately 100 murders in Dallas, Texas. One of those deaths occurred at Jim's Car Wash on June 2, 2019.

32. On June 5, 2019, the City of Dallas filed its Original Petition seeking a Temporary Restraining Order and Temporary and Permanent Injunction against Jim's Car Wash, preventing the my father and I from operating our business. The Defendants requested and were given a hearing on their Application for Temporary Restraining Order. They gave us of only one-hour notice before said hearing.

33. Following the hearing on Defendants' Application for Temporary Restraining Order, the Honorable Judge Eric Moye granted Defendants' Application and issued said Order, in effect closing Jim's Car Wash.

Executed on July 7, 2021.

_Dale Davenport_
Dale Davenport

# EXHIBIT 2

# REPORT ON JOINT INTERIM STUDY CHARGE TO THE 80TH TEXAS LEGISLATURE



## COMMITTEE ON
## CRIMINAL JURISPRUDENCE
## & GENERAL INVESTIGATING AND ETHICS COMMITTEE

### MARCH 2006

**HOUSE COMMITTEE ON CRIMINAL JURISPRUDENCE**
**TERRY KEEL**
**CHAIRMAN**
**&**
**HOUSE GENERAL INVESTIGATING AND ETHICS COMMITTEE**
**KEVIN BAILEY**
**CHAIRMAN**

**TEXAS HOUSE OF REPRESENTATIVES**
**REPORT ON JOINT INTERIM STUDY CHARGE 2006**

**A REPORT TO THE**
**HOUSE OF REPRESENTATIVES**
**80TH TEXAS LEGISLATURE**

**COMMITTEE CLERKS**
**DAMIAN DUARTE and RACHAEL SCHREIBER**
**&**
**ROBERTA BILSKY**



Committee On
Criminal Jurisprudence

February 28, 2006

Terry Keel
Chairman

P.O. Box 2910
Austin, Texas 78768-2910

The Honorable Tom Craddick
Speaker, Texas House of Representatives
Members of the Texas House of Representatives
Texas State Capitol, Rm. 2W.13
Austin, Texas 78701

Dear Mr. Speaker and Fellow Members:

The Committee on Criminal Jurisprudence of the Seventy-Ninth Legislature hereby submits its report on the joint interim study charge with the General Investigating and Ethics Committee pertaining to the use of the nuisance abatement authority by the City of Dallas for consideration by the Eightieth Legislature.

Respectfully submitted,

Terry Keel

Debbie Riddle

Paul Moreno

Mary Denny

Elvira Reyna

Richard Raymond

Terri Hodge

Aaron Pena

Juan Manuel Escobar

Debbie Riddle
Vice Chair

Members: Aaron Pena CBO, Paul Moreno, Mary Denny, Elvira Reyna, Richard Raymond, Terri Hodge, Juan Manuel Escobar



General Investigating and Ethics
Committee

February 28, 2006

Kevin Bailey
Chairman

P.O. Box 2910
Austin, Texas 78768-2910

The Honorable Tom Craddick
Speaker, Texas House of Representatives
Members of the Texas House of Representatives
Texas State Capitol, Rm. 2W.13
Austin, Texas 78701

Dear Mr. Speaker and Fellow Members:

The General Investigating and Ethics Committee of the Seventy-Ninth Legislature hereby submits its report on the joint interim study charge with the Committee on Criminal Jurisprudence pertaining to the use of the nuisance abatement authority by the City of Dallas for consideration by the Eightieth Legislature.

Respectfully submitted,

_Kevin Bailey_
Kevin Bailey

Ken Paxton

Harold Dutton

Terry Keel

Dan Flynn

Ken Paxton
Vice Chair

Members: Harold Dutton, Terry Keel, Dan Flynn

# HOUSE COMMITTEE ON CRIMINAL JURISPRUDENCE
## &
# GENERAL INVESTIGATING AND ETHICS COMMITTEE

## JOINT INTERIM STUDY CHARGE

*Monitor the use of nuisance abatement authority by the City of Dallas and investigate unresolved issues pertaining to allegations of possible civil rights violations that may have been committed under color of law by local government.*

## TABLE OF CONTENTS

BACKGROUND OF THE ISSUE ............................................................................. 1

SUMMARY OF PUBLIC HEARING TESTIMONY .................................................. 3

COMMITTEE RECOMMENDATIONS.................................................................. 29

    TESTIMONY AND EVIDENCE ........................................................................ 29

    SUMMARY .................................................................................................... 32

    LEGISLATIVE RECOMMENDATIONS ............................................................ 33

    ADDITIONAL ORDER .................................................................................... 34

## BACKGROUND OF THE ISSUE

The legislature has enacted and modified statutes over the years to enable local governments to take appropriate legal action against persons and property owners who tolerate or fail to prevent ongoing criminal activities on their property. Such criminal activities, referred to as common or public nuisances, include, but are not limited to, gambling, prostitution, illicit drug activity and organized crime. Common nuisances are addressed in the Civil Practice and Remedies Code, § 125.0015 (Chapter 125). During the 78th Regular Session, numerous changes were enacted to clarify this law and give municipalities additional tools to combat the two problems that most plague urban communities - drug activity and prostitution. Prior to passage of Senate Bill 1010 (78R), the statutes only allowed proof of *convictions* for crimes committed on a property to constitute *prime facie* evidence that a property owner had knowledge of illegal activities on the property. Passage of that legislation added language to the code to allow, for the first time, proof of *arrests* to also constitute such *prime facie* evidence.

Whenever authority created by the legislature is granted to local governments, it is with the assumption that the new law will be applied within the bounds of existing law and that sound discretion will be applied by local governments in the exercise of that power. However, during the 79th Regular Session, the House Committee on Civil Practices heard lengthy sworn testimony over the course of several weeks from a variety of citizens and business owners regarding misuse of Chapter 125 by the City of Dallas.

It was revealed in testimony that the wording of the statute in effect prior to the 79th legislative session had the unintended consequence of allowing the city to assert that anyone who "knowingly maintained property" was strictly held liable for a crime occurring on that property, even if they were law-abiding citizens who were taking affirmative action to protect themselves and their property from lawbreakers. Another unintended consequence was that arrests brought onto a property by city police were subsequently used by the city as evidence of nuisance abatement violations against that property owner. Sworn testimony before the house committee described specific cases of misuse of the statute by city officials such as:

- Targeting of a few, select businesses in high-crime areas, while ignoring more serious crimes occurring on surrounding properties;

- Directing businesses to hire certain security personnel with the clear suggestion that hiring these select individuals would diminish the city's threatened enforcement of nuisance abatement;

- Parking a large number of police cars in the parking lot of a business owner as a retaliatory act toward that owner, who had challenged the city's nuisance action against him and had testified in court on behalf of an individual who was acquitted of charges for resisting arrest while on the business' property;

1

- Using calls to police requesting assistance by the business as marks against that business in the city's criteria for evidence of nuisance abatement violations;

- Directing a hotel property owner to run criminal history checks on all guests, which is a possible violation of the guests' civil rights and could potentially subject the business to legal liability; and

- Sanctioning a local car wash owner because marihuana was found in the pants pocket of a person working on the property. It was suggested by the city legal department that the owner needed to conduct random pat-down searches of persons working on the property on a regular basis -- an act prohibited by law even for law enforcement officers.

The city's methods created a no-win situation for businesses. A business owner who did not call the police for help was branded as one who tolerated nuisances. On the other hand, calls made by a business for police assistance to apprehend individuals engaged in illegal activities were then used as evidence against the business that crime was occurring on their premises.

To clarify the language and prevent further misuse of the statute, the legislature enacted House Bill 1690, which states that a person maintains a common nuisance if the person "knowingly tolerates the activity and furthermore fails to make reasonable attempts to abate the activity". The legislation also specified that evidence that a person "requested law enforcement or emergency assistance with respect to an activity at the place where the common nuisance is allegedly maintained is not admissible for the purpose of showing the defendant tolerated the activity or failed to make reasonable attempts to abate the activity alleged to constitute the nuisance".

It was hoped that passage of House Bill 1690 would clarify the appropriate uses of the nuisance statute and curb the types of abuses that had been documented. In light of the testimony elicited during committee hearings during the 79th Legislative Session, the Speaker of the House of Representatives issued the following joint interim study charge to the House Committee on Criminal Jurisprudence and the House General Investigating and Ethics Committee:

***Monitor the use of nuisance abatement authority by the City of Dallas and investigate unresolved issues pertaining to allegations of possible civil rights violations that may have been committed under color of law by local government.***

# SUMMARY OF PUBLIC HEARING TESTIMONY

### _October 11, 2005_

| | |
|---|---|
| Richard Clouse | Senior Vice-President of Budget Suites of America. His company has been very cooperative with law enforcement in fighting crime on their property. He relayed a conversation that occurred between the SAFE Team and Budget Suites in an Accord Meeting on November 7, 2005 at which Budget Suites representatives were told that law enforcement was not to be contacted unless it was a life or death situation. As a result they cannot work with the Dallas Police Department (DPD) due to fear that it will be used against them. |

Their only recourse is to evict persons from the hotel rather than have them arrested, which compounds the problem. He believes complying with the City's requirements do more harm than good. The police department conducted undercover operations designed to create crime on the property. While the City alleges that six undercover drug buys were made on the property, Budget Suites was not contacted about these incidents until September with information about the drug buys. Five of the six buys were represented with no information to support what occurred on the property; there are no room numbers, names, or dates. Another incident refers to Room 1096, which was the subject of a smoke alarm inspection the day before the arrest and was found to have no criminal activity.

In September 2005, Budget Suites met with **Deputy Chief Julian Bernal** and four city attorneys and they confirmed the placement of undercover officers on the property and confirmed that incidents may be developed off property but brought onto the property

and that Budget Suites would still be responsible for the activity. This is bad faith and deprivation of due process rights and possibly fraud.

He expressed concern for the safety of his employees and clients when officers are bringing crime to the property. Budget Suites has never been involved in a litigation where the opposing party is free to continually take steps to undermine their business. He believes the company has enough evidence to pursue this through the civil process.

At a September meeting with Chief Bernal Mr. Clouse asked the chief what more could be done to prevent further problems. The chief could not think of anything. Mr. Clouse stated his belief that it was the SAFE Team and their supervisors who encourage criminal activity on the property. Mr. Clouse indicated that the situations whereby police officers bring criminal activity back to the property was occurring after HB 1690 was enacted.

Police posing as prostitutes will typically rent a room at the hotel and bring persons attempting to hire them back to the property and the activity is used against the property in the nuisance suit. There are about ten instances where police have brought crime onto the property and have attributed the crime to the business.

Chief David Kunkle

Dallas Police Department Chief of Police. The SAFE Team is a unit within DPD, members of which are selected through an application and interview process. The SAFE Team was created to deal with public nuisances utilizing an integrated unit involving police, code enforcement, fire department, and city attorneys. The SAFE Team cases typically operate with a

detective, code enforcement officer and a fire inspector. During the Accord Meetings, a supervisor is also involved. SAFE cases typically derive from the police department's own data, referrals from various units of the police, or community referrals.

The comments heard from Mr. Clouse are contrary to what he heard from a vice president of Budget Suites with whom he met after the legislative hearings in Austin. In that discussion, the vice president acknowledged having problems with security and bad management and had promised to work cooperatively with the police department. Chief Kunkle recently recommended reducing the SAFE Team unit from fifteen officers, three sergeants and one lieutenant to seven officers and a single sergeant because he believed that since so many people were working the SAFE Team, they could be reaching for cases that may not have been the most appropriate candidates. This recommendation was implemented on October 1, 2005.

The SAFE Team has been operating since 1991 and there are also many success stories involving the SAFE Team. The success of SAFE teams is measured by the reduction of abatable crimes. DPD simply wants Budget Suites to have good and reasonable business practices and he believes that there have been difficulties in communicating this message.

DPD prohibits the SAFE Team from encouraging businesses to hire off-duty officers. With regard to the situation discussed earlier that occurred in 2001, he believes the officer made a joking comment which was not to be taken seriously.

Chief Kunkle indicated that the SAFE
Team began in 1991 at the height of the
crack epidemic when Dallas had 500
murders that year. Lieutenants of the SAFE
Team are picked by chief level officers. No
SAFE Team operations occur unless the
property at issue has had three abatable
crimes within one year.

Most nuisance cases were focused on drug
houses, places of prostitution, and sexually
oriented businesses. Rep. Hodge expressed
her belief that the SAFE teams do not focus
adequately on drug houses. She also said
that none of the drug houses in her district
were effectively targeted by SAFE teams,
which were instead focusing on businesses.
In response, Chief Kunkle indicated that
what the committee is hearing about today
is a very small percentage of cases
involving the SAFE Team. Not all of the
cases involve businesses. In residential
properties, owners can just evict problem
tenants. Such an action is not applicable to
businesses. He said the car wash on MLK
is one of the most notorious drug dealing
locations in South Dallas.

The act of intimidation that occurred either
in 2001 or 2002 that involved a group of
officers (eleven police cars total) showing
up at the car wash on MLK with the intent
to intimidate the owner was inappropriate,
embarrassing, and stupid. It was done in
response to the car wash owner testifying
on behalf of a man cited for resisting arrest.
No action was taken internally against the
supervisor who carried out the act of
intimidation. Chief Kunkle agreed with
Rep. Keel that the action could be
potentially a civil rights violation or official
oppression under state law and he indicated
that the FBI has the information but was
unaware as to what has been done with it.

| | |
|---|---|
| Barbara Edmondson | Ex-owner of properties in Dallas. Ms. Edmondson shared with the committee instances in which police did not adequately react to drug activities on or near residential apartment locations. She believes that only when pressured by the Legislature will the police department properly enforce the law. She was informed by a Deputy Chief from the Southeast station of the results of a raid on a drug house: nine arrests were made, drugs and weapons were obtained, and a sex offender and a person carrying a gun were picked up. She wonders why there is police protection in certain areas and not in others. Ms. Edmondson claims that police will not address the Dixon Street and Grovewood areas of Dallas. She has been told by police that officers must tolerate drug dealing by boys because they need to support their families. The nuisance team has never touched or closed down any of the real drug houses on her street that she has reported. She was told by Chief Paulhill that police can only approach suspects based on probable cause of gun activity and not drug activity. |
| | When an area is deteriorated, code enforcement and police don't pay attention because there are federal funds available to refurbish the areas. Apartment tenants are scared of the police and won't call when disturbances arise, so they call the apartment management to call the police for them. |
| | A manager at her firm, who she later found out was dealing drugs, had contact with a Dallas City Council member and a liaison who told the manager that the police were going to raid his area and for him to clean it up. |
| Officer Ricardo Campbell | Dallas Police Officer. Officer Campbell |

patrols the area surrounding the Budget Suites and found the management to be cooperative in assisting to combat crime. He wrote a letter of support on behalf of a manager who was in fear of losing his job due to the activity that occurred on the property. The letter stated that the management was cooperative in helping the police to reduce crime. As a result, Officer Campbell was referred to Internal Affairs for violating a general order regarding outside correspondence. He was unaware of who initiated the referral. To his knowledge, there was a recommendation from a chief that the complaint should have been voided. He understands that it was wrong to violate departmental policy in writing the letter of support but would do it again because he believes the community and the police need to work together to combat crime.

| | |
|---|---|
| John Garner | Part-owner of Super Stop Beverage. Upon its opening, his business was protested by individuals **Councilman Chaney**. Protestors were concerned that there were too many liquor stores in the area. In 2003 and 2004 he was asked to donate $6,000 in two gifts to Clean South Dallas and he did so. Reps. Hodge and Keel questioned Mr. Garner as to who requested the donations. Mr. Garner stated that it was Councilman Chaney and that he subsequently spoke with the Councilman's staff regarding the donation. |
| Dale Davenport | Owner of Jim's Car Wash. He was approached by **Telitha Shaw**, a code enforcement officer, who told him she would have to write him a ticket based on instructions from her supervisors. He claims that he and another business owner were told by Councilman Chaney that "some business owners must die so others can thrive" regarding a moratorium on |

businesses considered to be non-conforming uses and required to obtain special-use permits to continue in operation. He was told by **Andy Seagal**, an attorney with the South Dallas Business Association, that the Councilman was not pleased with his commitments to the community and that he needed to make a donation to the African American Book Fair. Mr. Davenport donated $500. In January 2005, Mr. Davenport spoke to Councilman Chaney about the injunction on his business and Cheney suggested that Davenport hire the Nation of Islam or JL Security. Sixty percent of his revenue is spent on guard service required by the SAFE Team. As part of the injunction placed against his business, he must comply with all provisions of the judge's order for one year.

Dwaine Caraway

Questioned the selective enforcement targeted at Mr. Davenport's car wash instead of the drug houses around the car wash which he sees as more of a problem.

Robert Rowe

Mr. Rowe works as a night manager for a real estate company that owns three large apartment complexes in Dallas. He is also a retired Dallas police officer. When he calls the police because of a disturbance on the property, he says they first tell him what they cannot do. Then they proceed to tell him that they will help the property if he hires them off-duty. He would like an Attorney General's opinion to determine if it is legal to rent out police cars along with officers. He relayed a story in which he told police officers of a man who was beaten and robbed and asked them to call the ambulance. They told him they couldn't respond even though they were in uniform and in a police car because they were on their way to work off-duty security jobs.

Chief David Kunkle

The department began a program in the
early 1990s whereby neighborhood
associations can hire officers off-duty along
with old patrol cars that were to be put out
of service in order to patrol their residential
neighborhoods. He indicated that if he had
been chief at the time, he probably would
not have wanted to implement the program.
Rep. Dutton questioned the legality of the
program because it utilizes public property
for a private benefit. Chief Kunkle
responded that, in theory, the association is
paying the costs of the officer and the
patrol car along with the equipment in the
car. Rep. Dutton also stated that the
program may have constitutional problems
due to possible equal protection violations.

Rep. Keel also expressed concern that the
basic service taxpayers should receive from
the police force has been moved to a user-
fee basis. Rep. Dutton said that while
Dallas needs more police, the off-duty jobs
in the current form provide law
enforcement services only for those who
can afford to pay extra for those services.
He also suggested having constables
perform these off-duty neighborhood jobs
since their primary duty is not that of a
police function.

Chief Kunkle stated that the complaint
against Officer Campbell was received by
the police department and investigated.
The department found that no misconduct
occurred and he rescinded the complaint. In
response to a question from Rep. Keel, he
indicated that the complaint originated
from the City Attorney's office. Rep. Keel
said that the conduct by the City Attorney's
office was official oppression in that it was
attempting to intimidate an honest officer
who wrote a letter on behalf of a business
that is in an adverse situation with the City.

Calvin Johnson

Attorney for Dale Davenport. Mr. Johnson relayed a situation where two undercover police officers were sent to view situations occurring at Mr. Davenport's car wash. Mr. Davenport called the police over 100 times for assistance, but was response by DPD was often too late. He asked the officers during cross examination if they made any arrests while undercover at the car wash. They indicated they did not because they didn't want to compromise their undercover status. Mr. Davenport does everything he can to fight crime on the property while problem businesses in the neighborhood go unnoticed by the City. He expressed concern for the financial difficulties Mr. Davenport has undergone with regard to the City's stance against him.

Se-Gwen Tyler

Represents Arlington Park Neighborhood Association Crime Watch. She is very surprised to hear that police officers were paid to patrol certain areas, which her neighborhood cannot afford. She does not want to see the nuisance law weakened or abused. In her neighborhood there are several drug houses that have been busted four times during the past year. She is concerned that the drug dealers are being tipped off to the police raids because the dealers act in the open but when the raids occur they are nowhere to be found. She believes that drug dealing and prostitution does occur in Budget Suites.

**_October 12, 2005_**

Tom Perkins

City of Dallas City Attorney. Mr. Perkins testified that the City listened to concerns expressed by the Legislature and initiated a review of its SAFE Team practices and procedures. The City Manager authorized the formation of a Task Force comprised of members of the business community,

11

community groups, city offices, etc. to improve the SAFE Team process. The Task Force made several recommendations designed to foster a more cooperative approach in dealing with SAFE Team enforcement. The goal is to reserve litigation and aggressive procedures for those situations where all other efforts have failed.

Almost 2,000 SAFE Team investigations were opened over a four-year period and only 60 lawsuits were filed for an average of 15 each year. He feels the City Attorney's office use of the nuisance suits has been judicious. He was asked to respond to documents signed by Dallas citizens stating that on April 7, 2005 they were denied the right to testify before the House Committee on Civil Practices. These signed witness statements were prepared and provided to citizens by the City. Mr. Perkins said that although his office typed the statements for the South Dallas citizens, it was their own account of what occurred. He admitted that the City legal office used taxpayer dollars for the preparation and distribution of the statements.

Mr. Perkins was asked to identify all individuals who participated in the decision to lodge an internal affairs complaint against **Officer Ricardo Campbell**. He testified that **Asst. City Attorney Nicole Hobeiche** made the initial complaint verbally through a phone call to the police department. This complaint resulted in an investigation. The complaint stemmed from discovery responses during litigation with Budget Suites that revealed the property was providing local law enforcement officers residence in exchange for their agreement to patrol the property. He asked the committee to review the last page of their handout from the City, a grid of the

12

Budget property. Officer Campbell is shown as residing in one of the rooms. Mr. Perkins was asked to produce all notes, telephone memoranda, and background information documenting what was used to formulate the complaint. Mr. Perkins was unable to provide the information to the committee at that moment, but agreed to a request by Rep. Keel to provide the information to the committee at a later time.

He was asked who was contacted or interviewed as a result of the investigation. Mr. Perkins responded that his office simply turned over the information to DPD and had no other role in the investigation. He said Ms. Hobeiche spoke with the Internal Affairs Department investigator once. He was then asked to identify all the individuals who participated in the disciplinary process that was initiated and concluded against the officer. Mr. Perkins responded that he could not identify those individuals and would need to request the information from DPD. He was also asked to identify all City Attorneys who participated in the initiation of the complaint and with the investigation against Officer Campbell. Mr. Perkins was unable to identify the individuals at that moment, but agreed to provide the committee with the names before the end of the hearing.

Mr. Perkins was asked if the Task Force included individuals from the hotel/motel association or car wash association. He responded that it did not. Of all the lawsuits filed, there has only been one dealing with a car wash. He said he did not feel that certain groups were excluded, though he admitted that he did not invite anyone from the two associations mentioned. Mr. Perkins outlined the City's new operating

procedures. Rather than beginning an investigation with full SAFE Team involvement, Interactive Community Policing (ICP) officers and patrol officers will make an informal contact with the business. Instead of sending SAFE Team officers, local beat officers who are most familiar with the site will respond and begin the process of negotiating and discussing the best solutions. At that point, if they are unable to resolve the problem, a recommendation will be made to open a SAFE Team investigation.

This investigation requires documentation from the SAFE Team and recommendations from someone higher up in the chain of command. If after this review the decision is made to open up an investigation, that process will then begin. The SAFE Team will again attempt to cooperate with the business and reach a consensus. If there is still a problem with the property, there will be another round of recommendations and written documentation followed by a decision made by the First Assistant Chief of Police who will ultimately decide whether or not the case should be referred to the City Attorney's office for litigation. Mr. Perkins said this process will be a fair and good one for all stakeholders. This plan will also apply to residential communities.

He was asked what kind of funding is used for SAFE teams. He responded that General Fund monies from the Police Department are used, in addition to some Community Block Development Grant funds.

Mr. Perkins was asked about the document showing Officer Campbell's room at Budget Suites. He said his office simply turned the information over to chain of

14

command. He was then asked how many internal affairs complaints were filed on other officers living at that residence. The only complaint filed was against Officer Campbell. Rep. Keel stated that the only officer who had an IA complaint filed against him at City Legal was the one officer who befriended a business in an adverse legal position with the City Attorney's office. Mr. Perkins maintained that his office did not know the relationship between Officer Campbell and Budget Suites.

Steven Stefani
Corporate Counsel for Budget Suites of America. Mr. Stefani responded to an inquiry as to how many DPD officers were given residence at the aforementioned Budget location. He responded that three officers were provided residence and are shown on the diagram the City provided to the committee.

Tom Perkins
Mr. Perkins admitted that Officer Campbell was the only officer his office contacted DPD about but they did not file a complaint, they simply notified chain of command about what had occurred. The chain of command made whatever decisions they found appropriate at that point. He stated that his office did not actually contact Internal Affairs to file a complaint; they contacted **Lieutenant Hearn**, head of the SAFE Team. Mr. Perkins agreed that the only distinction between Officer Campbell and the other officers residing at Budget Suites was that he wrote an honest letter on behalf of the hotel and the City Attorney's office was in adverse litigation with that property. He could not explain why the names of the other officers were not handed over to DPD. He stated that his office did not know what any of the officers were doing there or whether it was legal or illegal. They alerted

the police department to the one situation involving Officer Campbell and turned it over to them.

The text of Officer Campbell's letter on behalf of Budget Suites was read to the committee. Mr. Perkins was asked if anything in the letter was untrue. He replied that he did not know that any of it was false.

Ron Waldrop

Assistant Chief of the Dallas Police Department, currently assigned as Bureau Commander over all investigations in the department. At the time of the incident being discussed, he was the Patrol West Bureau Commander and Officer Campbell worked for him. Mr. Waldrop was in the chain of command and reviewed the investigation. He recommended the department void the complaint and it was subsequently voided. The investigation of the complaint did not establish an employment relationship between Officer Campbell and Budget Suites. Had such a relationship been in existence, it would have been governed by departmental rules. The only thing the complaint sustained was that a letter was sent without going through the proper chain of command. He recommended to void the complaint because such incidents are not uncommon and the normal process for addressing such a violation is to have a supervisor talk with the officer. Mr. Waldrop stated that he did not think the issue rose to the level of an IAD complaint and recommended the complaint be voided. Chief Kunkle agreed and the entire investigation was rescinded.

He was asked by the committee how the IAD complaint occurred. He confirmed that it stemmed from a verbal notification of Lieutenant Hearn. Technically, Lt. Hearn requested the Internal Affairs investigation

from an internal source. He agreed that the City Attorney's complaint is what technically generated the IAD complaint.

He added that the map did show other officers residing at the Budget Suites and included their names. Another officer was interviewed on the matter of residency. The map shows an FBI room, a general police room, a room for **Robert Garcia**, and a room for Officer Campbell. Regardless of the content of the letter and whether it was favorable or unfavorable to Budget Suites, officers are not supposed to write such letters without going through the proper chain of command.

In response to questions about the procedure for police officers working off-duty, those officers must notify the department of who is employing them, specifically what they are doing, and the conditions of employment. There are rules about what an officer can and cannot do in extra jobs. DPD manages and tracks the off-duty employment of officers.

| | |
|---|---|
| Marshall Cornelius | Self-employed at Jim's Car Wash. Mr. Cornelius filed a complaint with Internal Affairs after **Officer Willie Demetrius Byrd** harassed, assaulted, and falsely arrested him. Officer Byrd told Cornelius that he could not wash cars at the car wash and proceeded to follow him to his home. Officer Byrd asked him to put his hands on the car, at which point he handcuffed him. He kicked Cornelius in the jaw three times and hit him in the back of the head. He was taken to detox where he stayed for two hours before Officer Byrd transferred him to Lou Sterrit jail where he was booked and spent 21 days for criminal mischief. After his release, Officer Byrd sought him out again and asked him if he "had a good vacation." He has not seen Officer Byrd |

since that visit. He provided the committee with the statements he gave to Internal Affairs in 2001. He has never heard from them.

Mr. Cornelius believes this harassment resulted from an incident when an individual escaped from Officer Byrd. Immediately after that event, Officer Byrd told the carwash staff that he would harass them until they told him where he could find the individual who ran from him. No one provided him with this information and the harassment continued on a daily basis with Officer Byrd forcing Mr. Cornelius and other individuals to leave the property because they were "pandering." Officer Byrd does not engage in this conduct with other car washes and he has told Mr. Cornelius and others that they may go down the street and wash cars at other businesses.

Mr. Cornelius also described a scene at the car wash where police officers arrested an individual on October 4, 2005 while wearing makeup and filming the incident.

Bobby Murphy

Mr. Murphy testified in court on behalf of **Kevin Black** in a dispute about whether it was Officer Byrd who assaulted him or Mr. Black who assaulted Officer Byrd. Kevin Black was acquitted and Mr. Murphy testified as a witness to the incident. The day after his testimony, Officer Byrd told him he would take him to jail every time he saw him. Mr. Murphy did not file a complaint with Internal Affairs.

Thomas Scott

Owner of The Wash Rack car wash. He has experienced numerous difficulties with homeless individuals, drug dealers, and prostitutes on his property. After learning of the situation with DPD and other car washes, he is now afraid to call DPD for

help with problems on his property for fear of losing his business. Mr. Scott purchased a Taser gun and pepper spray for protection. On two occasions DPD officers told him that hiring off-duty officers would help to eliminate the problems on his property. He also had an officer tell him that every time he calls DPD, it is recorded on the computer and counted against him. Another officer told him that Dale Davenport was in cahoots with the drug dealers and other criminal elements.

Mr. Scott has also asked for help with neighboring properties, but has never seen any results. He spoke with a SAFE Team officer about prostitutes living in cardboard boxes on the creek behind his car wash. They did not arrest the prostitutes, but did ask them to leave. Homeless people inhabit an abandoned building next door to his and after numerous calls, he was promised the property would be turned over to the City Attorney's office. No action has been taken. He testified that police are aware of drug dealing and crack houses that operate year after year with no consequences while honest businesspeople are harassed.

He approached officers within one block of his car wash and asked for help with homeless people on his property. The officers told him they could not assist him and instructed him to call 911. Mr. Scott estimated that when calling 911 it typically takes an hour and a half before anyone appears. He did have an officer take immediate action on one occasion but Mr. Scott cautioned that such behavior is not the norm.

James Mosser

Mr. Mosser is a lawyer who would like Chapter 125 repealed because it is used by the City to abuse property owners. Even when people fully comply, the City does

EXHIBIT 2

|  | not care and continues to harass individuals. Furthermore, the City does not respond to emergency calls. During trials he has questioned DPD officers who admit that they don't arrest prostitutes and drug users because they can't keep them in jail long enough or are waiting to catch larger dealers. Furthermore, he feels that the evidentiary standard should be changed to "clear and convincing." |

Willie Mae Coleman — Ms. Coleman is a resident of South Dallas who signed one of the statements prepared by the City Attorney's office. She stated that she prepared it along with the City. She had to leave the hearing that occurred in April at 9pm and could not testify.

She has reported approximately ten crack houses to the city and all but one has been eliminated. The remaining crack house is located on York Street.

William Vandivort — Mr. Vandivort is a Lake Highlands resident who described the efforts of his neighborhood association. He would like more nuisance suits filed by the City and the law strengthened.

Cheryl Pucci — Ms. Pucci represents the Apartment Association of Greater Dallas. She expressed her gratitude for HB 1690, which has greatly improved the SAFE Team process. She testified that apartment communities are lacking the same services and experiencing the same problems as businesses. In 2003, the apartment industry spent $40 million in security costs because they could not acquire police protection. Half of that cost was spent on hiring off-duty police officers. The $40 million figure does not include costs for lights, gating, intrusion alarms, etc.

Ms. Pucci described a 540-unit property at

Preston and Beltline, where she learned there were 4 abatable crimes in one year. These crimes did not appear on any police reports, crime statistics, or information given at monthly meetings. The SAFE Team visited the property with five police officers and a fire inspector, who went door to door testing smoke alarms.

She stated that she did not attend the property's Accord meeting with the City because she refused to be videotaped. Her refusal was based on information she received from a SAFE Team Sergeant who explained that participants are videotaped so the footage can be used against them in court proceedings.

During these meetings participants were also required to give the city their driver license. When the president of Ms. Pucci's company attended the Accord meeting, he received two citations for failing to attend a previous meeting, even though he sent representatives on his behalf. The citations were dismissed once an attorney was hired.

Steven Stefani

When these procedures were brought to the Police Chief's attention, they were changed.

Corporate Counsel for Budget Suites of America. Mr. Stefani described difficulties Budget Suites is experiencing with the City. His company requested to be advised of all undercover activities on their property so they could assist the police department. They have been told that they cannot be given such information, despite the fact that no other law enforcement agency in the nation has ever refused this request. The hotels are always apprised of undercover activities so they can protect their people and the operation.

In August 2005, they were made aware of undercover activities that had taken place throughout the month. Mr. Stefani said the timing of those activities is suspect, as it is two months after the legislation was passed and five months after the Rule 11 agreement was entered into between the Budget Suites and City of Dallas. Under this agreement, both parties agreed to suspend active prosecution of the hotel's defense and active prosecution of their case to allow Budget's system time to work. If they were working, the City would dismiss. In that five month period, there was not one abatable offense that occurred at the Budget Suites on Stemmons Freeway until the undercover activities. If not for the undercover activities of DPD directly calculated at their property and facilitated by individuals experienced and charged with the duty to create crime on that property, there would be no abatable crime reported for the month of August.

Budget Suites investigated the content of the letter they received on September 7, 2005 from the City Attorney's office. There were a total of 8 potentially abatable offenses, mainly drug buys, but also one of which was an assault with a weapon. The assault did not show up on surveillance tapes and Budget Suites has no way to confirm it. The undercover drug buys are not identified with any specificity- no individual is named, no time and date, and no description that helps Budget Suites abate the crime.

Mr. Stefani said Budget Suites requested an agreement in September during a meeting with **Deputy Chief Bernal, Assistant City Attorney Jennifer Richie, City Attorney Tom Perkins**, and **Officer Thompson**. Two undercover drug buys were listed in

the September 7th letter that an investigation by Budget Suites revealed to be off-property incidents that had been brought on property or assigned to the property. As a result, Mr. Stefani requested an agreement from the City Attorney's office and DPD that any abatable incident developed off-property but brought onto the property solely by undercover officers living on Budget Suites property, and where there was no other relationship between the other actors in that criminal transaction to the property, would not be held against Budget Suites as abatable offenses. The City refused to make that agreement.

He testified that Ms. Richie claims the scenario involved prostitution and that is not the case. When prostitutes are found living on the property and bringing clients onto the property, Budget Suites is committed to stopping such activity. The point of the agreement was that Budget Suites should not be held accountable for undercover crime stings that occur off of its property. Since that meeting, Budget Suites has evicted two individuals they later learned were undercover officers who were involved in various undercover activities. He stated that it is his understanding that the police department is extremely upset that these officers were evicted.

Mr. Stefani stated that the City Attorney's office will literally resort to tactics that compromise their ethics, the integrity of pending litigation, and the law. The City Attorney's office has sought to manipulate the course of discovery in their litigation by tampering with a witness and by seeking to quiet any other witnesses that may provide positive testimony for Budget Suites' defense.

The complaint against Officer Campbell was frivolous and the City Attorney directly involved in litigation has no business lodging an unethical complaint. Two other DPD officers received free housing and one Budget Suites room is identified as a General Apartment because there were several different officers using it. No complaints were lodged against them.

He feels the committee should thoroughly investigate further the prosecution of each common nuisance lawsuit brought by the City of Dallas.

**James Bearden** told Mr. Stefani that if they hired a Lieutenant or Sergeant from DPD, their "problems would go away." Mr. Bearden has administrated the examinations for the Texas Commission on Private Security for 20 years. Mr. Stefani stated the he would provide the committee with additional information on Mr. Bearden.

Mr. Stefani showed photographs of the Stemmons Freeway property. He gave the committee a videotape of a Channel 11 story from April 2005 where the Mayor boasts about the success of the common nuisance legislation and a Lieutenant talks about hiring off-duty officers.

He also discussed the InTown Suites directly adjacent to Budget Suites. Budget Suites' security efforts have identified that prostitutes and drug dealers live on the InTown property. A confidential informant that the City used in an undercover operation was living at the InTown suites and coming over to Budget Suites. There has been no action against the InTown Suites. Budget Suites offered the property a list of individuals no longer eligible to stay

at Budget Suites' properties and InTown declined the information. Budget Suites Regional Manager **Dana Alexander** stayed at the InTown Suites and left shortly after midnight because she felt unsafe due to the presence of prostitutes and drug dealers.

Budget Suites has chosen not to hire off-duty police officers. Instead, they hire security personnel who all have a minimum of five years actual law enforcement experience. Most of their security personnel are former military police with investigative backgrounds.

Dale Davenport

Owns Jim's Car Wash on 2702 MLK Blvd. He and his father bought the property in 1993 and invested $250,000 in the car wash after the purchase. He read a quote published in the Dallas Morning News on September 5, 2005, from **Senior Corporal Sheldon Smith,** who discusses his need for off-duty employment. Mr. Smith participated in Mr. Davenport's Accord meeting in 2001. Mr. Davenport said he feels this is a conflict of interest.

In 2001, the SAFE Team told him there were drugs on the property. When his father suggested a sting operation and that they work with the police, the police laughed. In 2003, the City filed a temporary restraining order against their business. The Davenports attended an Accord meeting during which they were told that they needed to do additional things to improve the safety of their property. While Mr. Davenport said they would install cameras, the City Attorney's office wanted them to hire a guard service instead. Two weeks after hiring guards, **Charlie Kim** said the City was not happy with the guard service and they needed to do a better job patrolling the property. This complaint occurred when they already had two armed

guards patrolling a property that is less than 25,000 square feet. He and his guard service have worked tirelessly to comply with the City. However, they asked him to fund 72 hours a week of security. The cost of this was prohibitive and demonstrates how businesses cannot survive with the City's current attitude. The permanent injunction is on their property until November 19th, 2005.

Mr. Davenport stated that he has called the police department over 100 times. The more he called the police, the more he was considered a public nuisance by the City.

He showed an incident report where his home was shot at on March 28, 2002, after testifying in the Kevin Black case. He went to Internal Affairs, but it was never investigated. He recently learned that case is just now being examined.

Ms. Richie stated on Channel 11 that there was a murder at his car wash. She referenced this during the trial, as well. Witnesses who saw the incident said it occurred 300-400 feet away from his property. Mr. Davenport stated that the City of Dallas will do anything to build a case against business owners.

He reviewed tapes of an arrest that happened on the car wash property involving officers in makeup holding camcorders. After investigating, he learned that it was for the filming of the television program Cops. Mr. Davenport did not give anyone permission to film a fake drug bust on their property and wondered how they were able to use DPD vehicles.

Tom Perkins

Mr. Perkins responded to questions about the Cops incident. He stated the he knows nothing about it, but would try to provide

the committee with information.

# COMMITTEE RECOMMENDATIONS

In fulfilling the charge to monitor the use of the nuisance abatement authority by the City of Dallas, the House Committee on Criminal Jurisprudence and the House General Investigating and Ethics Committee held a joint public hearing in Dallas and heard many hours of public testimony. The committees also received and reviewed numerous documents provided by city officials and concerned citizens. A review of the testimony and documents reveals that the concerns expressed by citizens and legislators during the regular session have not been resolved and the interim study has raised new concerns.

## TESTIMONY AND EVIDENCE

Multiple witnesses testified before the committees and repeated the allegations made during the regular session concerning the City of Dallas: that the city has in many instances targeted honest businesses in a selective application of the nuisance statute; that the number of abatable offenses used against a property included activities instigated by the police themselves (i.e., undercover operations where criminals are solicited by police to come on the property or traffic stops that happen to occur in the same block as the business); and that property owners were directed to hire off-duty Dallas Police Department officers with the implication that doing so would help end their legal conflict with the city. The most troubling aspect for the committees was testimony about the continuation of these practices even after the effective date of H.B. 1690, which included legislative changes designed to curtail these types of abuses.

The committees also heard testimony about new allegations that were equally disturbing. Chief among these addressed possible inappropriate attempts at witness retaliation involving the Budget Suites property located at 8150 North Stemmons Freeway, which at the time was being sued by the City of Dallas under the nuisance statute.

The incident concerned a letter of support written on behalf of the hotel by a Dallas patrol officer. The manager of the Budget Suites was justifiably concerned that crime statistics in and around the hotel, including crime brought onto the property by undercover Dallas police operations, traffic stops on the parking lot or public street adjacent to the property, or calls for assistance from the hotel itself, were being used by the City of Dallas as evidence that the business failed to abate crime. The manager approached several Dallas police officers to solicit a general letter of support for the hotel's efforts to combat criminal activity on the property. One officer, Ricardo Campbell, agreed to the request. On October 27, 2004, Officer Campbell provided the manager with a handwritten letter in which he stated in part:

*"I would like to commend the manager of the Budget Suites Hotel for their pro active approach in fighting crime at their establishment. Dallas police officers have made numerous arrests do* (sic) *to surveillance rooms that were provided through the Budget Suites Hotel. Management is very pro active in assisting officers by providing information and calling the police when they have a problem."*

29

The letter is dated only five days after the Dallas City Attorney's Office officially filed a nuisance suit against Budget Suites.   It is undisputed that Officer Campbell was unaware of the lawsuit when he wrote the letter to simply acknowledge the cooperation he had experienced first-hand as an officer working that patrol area.

On October 28, 2004, Officer Campbell's letter was provided to the City Attorney's Office by an attorney for Budget Suites during a meeting to discuss the lawsuit.   On that same day, the assistant city attorney assigned to the case contacted the head of the SAFE (Support Abatement Forfeiture and Enforcement) team responsible for conducting investigations against nuisance properties and objected to the letter, saying it could adversely affect the city's position in the lawsuit.   This complaint initiated an internal affairs investigation against Officer Campbell.

The internal affairs investigation was ultimately jettisoned by the police department administration on its own initiative.  However, Officer Campbell received a verbal reprimand regarding the writing of the letter.

The subject matter of this testimony --- an obvious attempt to intimidate a potential witness who simply wrote favorable comments about a business --- raised much concern for the committees.  It is apparent that the internal affairs investigation was initiated through the influence of the City Attorney's Office, which was in an adverse legal position with the business in question.  Members of the City Attorney's Office took exception to a Dallas police officer saying something favorable --- and by all accounts truthful --- about that business, and attempted to punish him.   The committees expressed their apprehension that such an act of attempted intimidation might constitute official oppression by city officials and, at the very least, supported charges that the city acts in a heavy-handed and retaliatory manner when enforcing its nuisance ordinance.

Enforcement of nuisance laws is not and cannot be based solely on an owner's awareness of the occurrence of crime on their property.  In fact, because Dallas has one of the highest crime rates in the nation, business owners often find themselves victimized by crime.  Business owners should only be held responsible for criminal activities that occur on their premises if there is some evidence that the owner failed to take reasonable steps to stop crime or is tolerating the illegal activity.  The incident involving the letter from Officer Campbell sustains allegations made by citizens that the City of Dallas often ignores the good faith efforts of property owners to fight criminal activity and instead misuses the nuisance abatement law to punitively target certain businesses.

Similarly, the committees found the testimony concerning the practices used by the city in its "accord meetings" equally troubling.  These meetings are held as a means of informal arbitration to supposedly facilitate a discussion about suggested strategies for property owners to prevent criminal activity by others on their property.  If the property owner fails to make reasonable attempts to stop the activity, the SAFE team then refers the case to the City Attorney's Office for the possible filing of a nuisance suit.

Citizens testified that the accord meetings resemble more of an interrogation of an arrestee rather than an exchange of information. The city uses intimidation tactics such as requiring property owners or their representatives to surrender their driver's license before being admitted to the meeting as well as obtaining consent to be videotaped, ostensibly for use in court if an agreement can not be reached. Anyone who refused consent was barred from the meeting by the city with the threat that the city would use their "failure to attend" the meeting as further evidence of their unwillingness to combat crime on their property. This testimony again supports the contention that there is an unfair and misdirected culture among the city's nuisance abatement personnel toward property owners who may themselves be victims of crime and who attend these meetings in a good faith attempt to cooperate with the city to combat criminal activity on their property.

The committees also heard from citizens who expressed concern about the inadequacy of law enforcement resources to help fight crime on their properties and in their communities. The committees were told by representatives of properties under a nuisance investigation and by ordinary citizens that police officers routinely suggested that the only effective solution to potential adverse nuisance abatement litigation from the city was hiring off-duty Dallas police officers. The implication was clear – that only through the supplemental hiring of off-duty officers could basic police service be expected to take place and citizens could not expect the city police department to effectively address crime in their area.

In essence, the citizens of Dallas, who have paid their taxes for law enforcement services from the police department, were in some cases being told that even basic calls for service would be ignored. Some witnesses alleged they were told by the police department *not to call about anything unless it was a life and death situation.* It bears repeating that such calls were also being used as a threat to be counted against the caller, who would then potentially find themselves as a defendant in a possible nuisance abatement action from the City Attorney's Office.

The committees heard evidence, which had also been heard by the House Committee on Civil Practices during the 79th Regular Session, alleging that certain elected officials were involved in directing property owners to hire certain security personnel or make contributions to particular causes in order to mitigate the city's pursuit of the business through the nuisance abatement statute.

Underlying the repeated allegations heard by the committees is a recurrent theme of ward-based politics run amok as the selective enforcement of nuisance laws protect politically-connected insiders and punish their competitors. The committees heard allegations of undue political influence being used to benefit businesses and property owners who responded favorably to "suggestions" that they channel funds into an incumbent official's favored non-profit organization or that they hire security personnel from a company owned by another local elected official with powerful political ties. Those who refuse to play by such rules, the committees heard repeatedly, found themselves the target of random police

searches, fire and other code inspections and costly, time-consuming litigation. Worse yet were allegations of deliberate acts of intimidation by uniformed police including at least one reported instance of assault and false arrest and another account, verified by city officials, of nearly a dozen marked patrol cars converging on the premises of a business in apparent retaliation following the owner's testimony in court on behalf of an individual charged with resisting arrest and who was subsequently acquitted of all charges.

As a result, the committees are gravely concerned that the problems stemming from Dallas' use of the nuisance laws are the result of a unique and incorrect interpretation of those laws by city officials -- wrongly taking the laws to mean that fighting crime is no longer the city's responsibility but has instead now become primarily the responsibility of private citizens and businesses; and that private citizens can be held strictly liable for crimes that take place on or near their property even when they are not involved in that crime, have taken affirmative steps to prevent the crime, are themselves victims of that crime, and have reported the crime, requesting the assistance of law enforcement agencies. Furthermore, the body of evidence available to the committees also strongly suggests that the city uses the nuisance laws to intimidate, promote cronyism, and inappropriately use law enforcement personnel, specifically uniformed police and code enforcement officers, to deliver not-too-subtle messages of coercion and retaliation to legitimate businesses and property owners who refuse to submit to such tactics.

It should be noted that during his relatively short tenure, the current Dallas Chief of Police, David Kunkle, has attempted to change some of the troubling ways the city exercises its enforcement of the nuisance laws. On October 1, 2005, at Chief Kunkle's recommendation, the size of the SAFE team was reduced from fifteen officers, three sergeants and one lieutenant to seven officers and a single sergeant out of concern that having so many people working on the SAFE team could result in filing inappropriate cases. Procedures for the accord meetings were modified in response to legitimate complaints about the hostile and adversarial approach taken by the city. The attention given to these issues by Chief Kunkle is admirable and the committees believe most employees and officials of the City of Dallas are dedicated to serving the public with honor and integrity. However, the abuses recounted in extensive testimony indicate enough grave irregularities in the city's conduct that the committees remain skeptical that the city, and the City Attorney's Office in particular, will appropriately exercise discretion in the pursuit of nuisance lawsuits in the absence of further legislative action.

## SUMMARY

The committees received live testimony and other documentary evidence that shows a continuing pattern of abuse in the utilization of Chapter 125, Civil Practice & Remedies Code, by the City of Dallas. Over the past few years, the legislature has responded to the legitimate need of municipalities for stronger nuisance laws to help rid their communities of scourges such as crack houses, locations for proliferation of prostitution, and the plague of abandoned inner-city properties. Cities such as Dallas have faced very real difficulties in dealing with absentee landlords or owners who conveniently turn a blind eye to the illicit

drug trade or prostitution taking place on their properties. However, evidence presented to the committees strongly suggests that the broadened police powers the legislature intended for cities to use with thoughtful discretion have instead been misused by the City of Dallas to target legitimate businesses while ignoring crime on adjacent properties. Routine traffic stops, where drivers are pulled off of public roads onto specific private properties, are often used by the city as evidence against the unwitting property owner instead of the alleged perpetrator. In addition, undercover agents have invited illegal activities such as potential drug deals and prostitution onto specific private properties so that the city could then use those arrests against the unsuspecting property owner. Calls to police by property owners who observe criminal activity taking place on their property have in many instances not resulted in the arrest of the perpetrator, but instead have been used as evidence against the property owner for failure to stop the crime. Private property owners have in some cases been scolded for calling the police and told by city officials that the solution is to hire off-duty Dallas police officers. Money has been solicited by politicians from businesses involved in conflicts with the city over enforcement of the nuisance laws, with the clear implication that such contributions would mitigate that business' problems with the city. Personnel with the City Attorney's Office have engaged in attempts to intimidate one police witness solely because the officer's honesty could potentially harm the city's legal position in a civil lawsuit against a business.

## LEGISLATIVE RECOMMENDATIONS

The House Committee on Criminal Jurisprudence and the House General Investigating and Ethics Committee submit the following recommendations for consideration by the 80th Legislature:

- legislation should be considered regarding the propriety of a city using criminal activity that was brought onto a property by law enforcement when that city takes action against that property under Chapter 125, Civil Practice & Remedies Code;

- the legislature should consider addressing the appropriateness and legality of municipalities utilizing Chapter 125 to selectively target a particular business while crime proliferates on adjacent properties and is ignored;

- the legislature should consider whether it is an appropriate use of government personnel and equipment for cities to sell police protection for a separate user fee where the city has purposefully discouraged citizens and businesses from calling for help from the police in ordinary circumstances;

- the legislature should continue to monitor the use of the nuisance abatement authority by the City of Dallas to ensure that the provisions of House Bill 1690 are faithfully implemented; and

- the legislature should consider enacting a procedure for specific sanctions that can be sought by the Texas Attorney General and levied against an offending municipality if abuses in the utilization of Chapter 125 are proven.

### ADDITIONAL ORDER

The House Committee on Criminal Jurisprudence and the House General Investigating and Ethics Committee direct the committee clerks to forward a copy of this report and relevant documents to the State Bar of Texas for a determination of any violation of rules of professional responsibility pertaining to the role of the Dallas City Attorney's Office in initiating an internal affairs investigation against Officer Ricardo Campbell and the committees furthermore direct the State Bar of Texas to report its progress and findings to the House General Investigating and Ethics Committee.

# EXHIBIT 3

# South Dallas/Fair Park Public Improvement District
## Service Plan Budget (2017-2023)

| | (Yr 1) 2017 | | (Yr 2) 2018 | | (Yr 3) 2019 | | (Yr 4) 2020 | | (Yr 5) 2021 | | (Yr 6) 2022 | | (Yr 7) 2023 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | | | | | | | |
| Net Assessment | 110,247 | | 121,271 | | 133,399 | | 153,408 | | 176,420 | | 202,883 | | 233,315 | | 1,130,943 |
| *Interest on Cash Balance* | | | | | | | | | | | | | | | |
| *Surplus Carried forward* | - | | 3,307 | | 7,045 | | 11,258 | | 16,198 | | 21,977 | | 28,722 | | |
| **Total Income** | 110,246.79 | | 124,578.87 | | 140,443.39 | | 164,666.48 | | 192,617.74 | | 224,859.22 | | 262,037.39 | | $ 1,219,449.87 |
| | | | | | | | | | | | | | | | |
| **EXPENDITURES** | | | | | | | | | | | | | | | |
| (1) Public Safety | 49,611 | 45% | 43,603 | 35% | 49,155 | 35% | 49,400 | 30% | 48,154 | 25% | 67,458 | 30% | 52,407 | 20% | |
| (2) Improvements | 27,562 | 25% | 49,832 | 40% | 56,177 | 40% | 74,100 | 45% | 96,309 | 50% | 101,187 | 45% | 151,982 | 58% | |
| (3) Promotion | 11,025 | 10% | 6,229 | 5% | 7,022 | 5% | 8,233 | 5% | 9,631 | 5% | 11,243 | 5% | 13,102 | 5% | |
| (4) Administration | 11,025 | 10% | 12,458 | 10% | 14,044 | 10% | 16,467 | 10% | 19,262 | 10% | 22,486 | 10% | 26,204 | 10% | |
| (5) Contingency/Carryover | 3,307 | 3% | 3,737 | 3% | 4,213 | 3% | 4,940 | 3% | 5,779 | 3% | 6,746 | 3% | - | 0% | |
| (6) Insurance | 5,512 | 5% | 6,229 | 5% | 7,022 | 5% | 8,233 | 5% | 9,631 | 5% | 11,243 | 5% | 13,102 | 5% | |
| (7) Audit | 2,205 | 2% | 2,492 | 2% | 2,809 | 2% | 3,293 | 2% | 3,852 | 2% | 4,497 | 2% | 5,241 | 2% | |
| | | | | | | | | | | | | | - | | |
| | | 100% | | 100% | | 100% | | 100% | | 100% | | 100% | | 100% | |
| **Total Expenses** | 110,246.79 | | 124,578.87 | | 140,443.39 | | 164,666.48 | | 192,617.74 | | 224,859.22 | | 262,037.39 | | $ 1,219,449.87 |

(1) Public Safety: Courtesy patrol, patrol vehicles, safety related expenses
(2) Improvements: Landscaping, lighting, sidewalks, streets, parks, fountains, roadways,  improvement related expenses
(3) Promotion: Outreach, business development, marketing, website, forums, promotion related expenses
(4) Administration: Office supplies, administration, mailings, administrative related expenses
(5) Contingency/Carryover: Contingency allocation for other expenditures; future capital improvement project
(6) Insurance: Insurance policy
(7) Audit; Annual audit fee

# EXHIBIT 4

FIELD MAIL

Comptroller
of Public
Accounts
FORM
05-102
(Rev.9-13/32)

**Texas Franchise Tax Public Information Report**
*To be filed by Corporations, Limited Liability Companies (LLC) and Financial Institutions*
**This report MUST be signed and filed to satisfy franchise tax requirements**

■ **Tcode** 13196 Franchise

| ■ Taxpayer number | | | | | | | | | | ■ Report year | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 2 | 0 | 3 | 4 | 0 | 3 | 6 | 6 | 2 | 7 | 2 | 0 | 1 | 4 |

*You have certain rights under Chapter 552 and 559, Government Code, to review, request and correct information we have on file about you. Contact us at 1-800-252-1381.*

| Taxpayer name | HIP HOP GOVERNMENT, INC | | ○ Blacken circle if the mailing address has changed. |
|---|---|---|---|
| Mailing address | 203 E. BOURN ST | | Secretary of State (SOS) file number or Comptroller file number |
| City ROCKWALL | State TX | ZIP Code 75087  Plus 4 4320 | 800891120 |

● Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

| Principal office | |
|---|---|
| Principal place of business | |

*Please sign below!*

Officer, director and manager information is reported as of the date a Public Information Report is completed. The information is updated annually as part of the franchise tax report. There is no requirement or procedure for supplementing the information as officers, directors, or managers change throughout the year.

**SECTION A**   Name, title and mailing address of each officer, director or manager.

3203403662714

| Name | | Title | | Director ○ YES | | Term expiration | m m d d y y |
|---|---|---|---|---|---|---|---|
| Mailing address | | City | | State | | ZIP Code | |
| Name | | Title | | Director ○ YES | | Term expiration | m m d d y y |
| Mailing address | | City | | State | | ZIP Code | |
| Name | | Title | | Director ○ YES | | Term expiration | m m d d y y |
| Mailing address | | City | | State | | ZIP Code | |

**SECTION B**   Enter the information required for each corporation or LLC, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| Name of owned (subsidiary) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |

**SECTION C**   Enter the information required for each corporation or LLC, if any, that owns an interest of 10 percent or more in this entity or limited liability company.

| Name of owned (parent) corporation or limited liability company | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|

| Registered agent and registered office currently on file *(see instructions if you need to make changes)* | | ○ Blacken circle if you need forms to change the registered agent or registered office information. |
|---|---|---|
| Agent: | | |
| Office: | City | State  ZIP Code |

The above information is required by Section 171.203 of the Tax Code for each corporation or limited liability company that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B, and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director or manager and who is not currently employed by this, or a related, corporation or limited liability company.

| sign here ▶ | Title PRESIDENT | Date 07/07/2014 | Area code and phone number ( 469 ) 600 - 5829 |
|---|---|---|---|

**Texas Comptroller Official Use Only**

| VE/DE ○ | PIR IND ○ |
|---|---|

**Form 424**
**(Revised 05/11)**

Submit in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512/463-5709
**Filing Fee: See instructions**



**Certificate of Amendment**

This space reserved for office use.

FILED
In the Office of the
Secretary of State of Texas

DEC 2 3 2013

Corporations Section

## Entity Information

The name of the filing entity is:

*Hip Hop Government, Inc.*

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

☐ For-profit Corporation                      ☐ Professional Corporation
☒ Nonprofit Corporation                       ☐ Professional Limited Liability Company
☐ Cooperative Association                      ☐ Professional Association
☐ Limited Liability Company                    ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is: *0800891120*
The date of formation of the entity is: *10/31/2007*

## Amendments

### 1. Amended Name
(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity. The article or provision is amended to read as follows:

Form 424    6

**Registered Agent**
(Complete either A or B, but not both. Also complete C.)

☐ **A.** The registered agent is an organization (cannot be entity named above) by the name of:

_____

**OR**

☐ **B.** The registered agent is an individual resident of the state whose name is:

_____

_First Name_      _M.I._      _Last Name_      _Suffix_

The person executing this instrument affirms that the person designated as the new registered agent has consented to serve as registered agent.

**C.** The business address of the registered agent and the registered office address is:

                                                  TX

_Street Address (No P.O. Box)_      _City_      _State_   _Zip Code_

## 3. Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below. If the space provided is insufficient, incorporate the additional text by providing an attachment to this form. Please read the instructions to this form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

☒ **Add** each of the following provisions to the certificate of formation. The identification or reference of the added provision and the full text are as follows:

Article 5
The Organization is organized exclusively for chantable,
religious, educational, and/or scientific purposes under Section 501(c)(3)
of the Internal Revenue Code

☐ **Alter** each of the following provisions of the certificate of formation. The identification or reference of the altered provision and the full text of the provision as amended are as follows:



☒ **Delete** each of the provisions identified below from the certificate of formation.

Article 5
Voting Drive Organizers - Volunteer Coordinators for Disenfranchised
Target Population

## Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the Texas Business Organizations Code and by the governing documents of the entity.

Form 424                         7

## Effectiveness of Filing (Select either A, B, or C.)

A. ☒ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: 12-16-13

By: Hip Hop Government Inc.
_____
Signature of authorized person

JEREMY SOROGGINS
_____
Printed or typed name of authorized person (see instructions)

Form 424                                    8

**EXHIBIT 4**

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

Rolando B. Pablos
Secretary of State

# Forfeiture pursuant to Section 171.309 of the Texas Tax Code
## of
# Hip Hop Government, Inc.

File Number : 800891120                    Certificate / Charter forfeited :   January 26, 2018

The Secretary of State finds that:

1. The Secretary has received certification from the Comptroller of Public Accounts under Section 171.302 of the Texas Tax Code indicating that there are grounds for the forfeiture of the taxable entity's charter, certificate or registration; and

2. The Comptroller of Public Accounts has determined that the taxable entity has not revived its forfeited privileges within 120 days after the date that the privileges were forfeited.

Therefore, pursuant to Section 171.309 of the Texas Tax Code, the Secretary of State hereby forfeits the charter, certificate or registration of the taxable entity as of the date noted above and records this notice of forfeiture in the permanent files and records of the entity.





Rolando B. Pablos
Secretary of State

Come visit us on the Internet @http://www.sos.state.tx.us/

(512) 463-5555                    FAX (512) 463-5709

TID 7-1-1

# EXHIBIT 5

EXHIBIT 5

< All Inboxes 　　　　∧ ∨

From: **Warren Mitchell** ›　　　WM

　　　　　　　　　　**Hide**

---

## Southeast Overtime

May 25, 2018 at 12:38 PM

🗀 Found in Exchange Inbox

---

*\*\*\*I am just the sender of this email. If you have any questions, please contact a supervisor at Southeast Patrol.\*\*\**

Southeast Patrol Division has City Overtime or Compensation Time available for all ranks on Monday, May 28, 2018. The hours are <u>from 2pm – 10pm</u>. Overtime will cover South Dallas (Rochester Park and the MLK car wash).
If you are interested, please log onto https:// www.volunteersignup.org/T8MAX to sign up.

**If you work the OT, please remember to:**
-Check in with the Sgt. who is over the OT Shift and ask for your Element #.
-If there isn't a Sgt. assigned, check in with the Station SGT for your Element #.
-Complete your activity sheet and place in the designated tray outside the LT's office.

    

 All Inboxes

***I am just the sender of this email.  If you have any questions, please contact a supervisor at Southeast Patrol.***

Southeast Patrol Division has City Overtime or Compensation Time available for all ranks on Monday, May 28, 2018.  The hours are from 2pm – 10pm.  Overtime will cover South Dallas (Rochester Park and the MLK car wash).
If you are interested, please log onto https://www.volunteersignup.org/T8MAX to sign up.

**If you work the OT, please remember to:**
-Check in with the Sgt. who is over the OT Shift and ask for your Element #.
-If there isn't a Sgt. assigned, check in with the Station SGT for your Element #.
-Complete your activity sheet and place in the designated tray outside the LT's office.

If there are any questions, ask the assigned OT  Sgt., or the Station Sgt.

# EXHIBIT 6

EXHIBIT 6

OFFICIAL ACTION OF THE DALLAS CITY COUNCIL

OCTOBER 24, 2018

18-1529

Item 57:     A resolution requesting the Board of Adjustment to authorize compliance proceedings for Jim's Car Wash located at 2702 Martin Luther King, Jr. Boulevard, Dallas, Texas - Financing: No cost consideration to the City (via Council Members Felder, Clayton, Griggs, Thomas, Narvaez)

The following individuals addressed the city council on the item:

> Marilynn Mayse, 4306 York St.
> Willie Mae Coleman, 3802 York St., representing Bertrand Neighborhood Association
> Hank Lawson, 2402 Park Row Ave.
> Ronald Chambers, 6655 Buckeye Common Way
> Heather Livingston, 2734 South Blvd.
> Harry Robinson, 2424 South Blvd.
> Austin Cullins, 2733 South Blvd.
> Steven Deering, 2401 South Blvd.
> Betty Bryan-Priesing, 1306 Rio Hondo Dr.
> Brandon Valadez, 9147 Bretshire Dr., representing Jim's Car Wash
> Kourtnie Roy, (private), representing Lincoln High School
> Diane Ragsdale, 3611 Dunbar St., representing South Dallas/Fair Park Inner City
> Gary Priesing, 1306 Rio Hondo St., representing Jim's Car Wash
> Dale Davenport, 2707 Martin Luther King Jr. Blvd.
> Patti Priesing, 9147 Bretshire Dr.
> Kedric McKnight, 1600 Pennsylvania Ave., representing St. Philips School and Center
> Ron Hall, 241 Private Rd 7416, Wills Point, TX
> Bruce Toppin, 745 E. Mulberry Ave., San Antonio, TX, representing Independent Bankers Association of Texas
> Irungu Bakari, 3211 Hickory Tree Rd., Balch Springs, TX
> Mel Ulrick, 4600 Spicewood Springs Rd., Austin, TX, representing Southwest Car Wash Association

Councilmember Felder moved to adopt the item.

Motion seconded by Councilmember Callahan.

During discussion and at the request of Councilmember Felder, the following individual addressed the city council on the item:

> Michelle Morgan, 2516 Martin Luther King Blvd.

OFFICE OF THE CITY SECRETARY                    CITY OF DALLAS, TEXAS

EXHIBIT 6

OFFICIAL ACTION OF THE DALLAS CITY COUNCIL
18-1529
Page 2

After discussion, Mayor Rawlings called a record vote on Councilmember Felder's motion to adopt the item:

Voting Yes:   [12]   Rawlings, Thomas, Medrano, Griggs, Callahan, Narvaez, Felder, Atkins, Clayton, McGough, Kleinman, Gates

Voting No:   [2]   Greyson, Kingston

The city secretary declared item adopted.

OFFICE OF THE CITY SECRETARY                    CITY OF DALLAS, TEXAS

# EXHIBIT 7

Cause No. DC-19-04899

| | | |
|---|---|---|
| FREDDY DAVENPORT, et al | § | IN THE DISTRICT COURT |
| Plaintiffs, | § | |
| | § | |
| v. | § | 14TH JUDICIAL DISTRICT |
| | § | |
| | § | |
| CITY OF DALLAS, et al | § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |

### TEMPORARY INJUNCTION

ON THIS DAY, came to be heard the City of Dallas's Request for Temporary Injunction against Counter-Defendants, Freddy Davenport d/b/a Jim's Car Wash, Dale Davenport, and 2702 Martin Luther King Jr. Blvd., Dallas, Texas, *in rem* (collectively, "Defendants"). Plaintiff, the City of Dallas (the "City") appeared before this Court. Defendants were properly served with notice of this hearing and did appear. Upon consideration of the pleadings, evidence presented, and the arguments of the parties, the Court finds good cause to enter this Temporary Injunction.

Further, the Court hereby finds the following:

The City of Dallas is a home-rule municipal corporation situated mainly in Dallas County, Texas, incorporated and operating under the laws of the State of Texas.

Venue is proper and this Court has jurisdiction pursuant to Section 125.002 of the Texas Civil Practice and Remedies Code.

Defendants, Freddy Davenport and Dale Davenport, are individuals owning and controlling the real property located at Block 21/1290, and commonly known as 2702 Martin Luther King Jr. Blvd., Dallas, Texas, *in rem* (the "Property"), also known as Jim's Car Wash (the "Property").

The Property consists of a self-service car wash that is located in the Southeast area of the City.

TEMPORARY INJUNCTION                                                                                      1

The preponderance of the evidence from this hearing shows that the Property is a place to which persons habitually go to commit crimes such as possession/manufacture/delivery of controlled substances, unlawfully carrying a weapon, aggravated assault, murder, criminal trespass, and disorderly conduct. Further, the evidence shows that the owners of the Property, Defendants Freddy Davenport and Dale Davenport, knowingly tolerate the criminal activity on the Property and knowingly maintain the Property as a common nuisance.

In addition, the Court finds that Defendants failed to comply with the Court's temporary restraining order issued June 6, 2019. Defendants failed to hire certified peace officers to patrol the Property, did not limit the hours of the business on the Property, and did not limit the amount of time customers could remain on the Property. Although the business is now closed, Defendants failed to post and maintain barricades as ordered and failed to hire security as ordered under the temporary restraining order.

This Temporary Injunction is necessary to protect the citizens of Dallas from the harm that would occur in its absence, namely the habitual occurrence of abatable crimes at the Property.

**IT IS THEREFORE ORDERED** that Defendants, their guests, agents, employees, assigns, successors in interest, and any other persons in privity with Defendants shall immediately cease and desist from maintaining the Property as a common nuisance.

**IT IS FURTHER ORDERED** that Defendants, their guests, agents, employees, assigns, successors in interest, and any other persons in privity with Defendants shall take the following additional actions to abate the common nuisance on the Property pursuant to Section 125.045 of the Texas Civil Practice and Remedies Code:

      a. Hire a minimum of two certified peace officers to patrol the Property together, for 24 hours per day, seven days a week, during the pendency of this order;

b.  Limit the hours of operation of the car wash business to the time between 7:00a.m. and 9:00p.m. daily, install and maintain signage that states such hours of operation, and ensure the Property is not occupied outside of business hours;

.c.  Limit the amount of time that any individual customer is permitted on the Property to one (1) hour;

d.  Maintain all security lighting;

e.  In the alternative, if Defendants close the business on the Property, Defendants are ordered to post and maintain barricades sufficient to prevent trespassing for all points of ingress and egress on the Property and are required to maintain a minimum of two certified peace officers to patrol the Property together, for 24 hours per day, seven days a week, to be sure that the Property is secured and not being trespassed upon.

**IT IS FURTHER ORDERED** that Defendants shall provide notice of this Temporary Injunction to any subsequent holder, successor in interest, purchaser, or owner, and inform such subsequent holder, successor in interest, purchaser, or owner that he or she shall be bound by the terms and conditions contained within this Temporary Injunction.

**IT IS THEREFORE ORDERED** that Defendants shall execute a bond in the amount of $ 500  (no less than $5,000, not more than $10,000). Said bond is ordered pursuant to Section 125.045(a) of the Texas Civil Practice and Remedies Code. The bond shall be made payable to the State of Texas at the City of Dallas, Texas, and shall have sufficient sureties approved by the Court. Further, the bond shall be conditioned that Defendants will not knowingly maintain a Common Nuisance on the Property. This Bond shall be posted within __7__ days after the Court signs this Injunction.

TEMPORARY INJUNCTION                                                        3

No bond is required to be posted by Plaintiff, City of Dallas.

The *Permanent Injunction Hearing and Full Trial on the Merits* is set for __31  March__ , ~~2019~~ 2020 at __9:30__ (a.m)/p.m. in the 1~~00~~th Judicial District Court of Dallas County, Texas.

Signed this __2 4__ day of _____, 2019.

_____
PRESIDING JUDGE

TEMPORARY INJUNCTION                                                            4

# EXHIBIT 8

CAUSE NO. DC-19-08101

| | | |
|---|---|---|
| CITY OF DALLAS, | § | IN THE DISTRICT COURT |
|        Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| FREDDY DAVENPORT, | § | DALLAS COUNTY, TEXAS |
| DALE DAVENPORT, | § | |
| and 2702 MARTIN LUTHER KING | § | |
| JR. BLVD., DALLAS, TEXAS, | § | |
| *in rem*, | § | |
|        Defendants. | § | 14th JUDICIAL DISTRICT |

## TEMPORARY RESTRAINING ORDER

ON THIS DAY, came to be heard the City of Dallas's Request Verified Application for Temporary Restraining Order. Kristen Monkhouse and Andrew Gilbert, attorneys for City of Dallas, appeared in person. Defendants, Freddy Davenport, Dale Davenport, and 2702 Martin Luther King Jr. Blvd., Dallas, Texas, *in rem* (collectively, "Defendants") did appear, through their counsel, Warren Norred.

City of Dallas, Plaintiff in this cause, has filed a verified petition for temporary and permanent injunction with supporting affidavits and, in connection therewith, has presented a request for a temporary restraining order, as set forth in *City of Dallas's Original Petition and Verified Application for Temporary Restraining Order and Temporary and Permanent Injunction* ("City's Petition").

It clearly appears from the facts set forth in the City's Petition that Defendants are knowingly tolerating and maintaining a common nuisance as defined in Chapter 125 of the Texas Civil Practice and Remedies Code at the real property located at Block 21/1290 and commonly known as 2702 Martin Luther King Jr. Blvd., Dallas, Texas upon which is a self-service car wash facility named Jim's Car Wash (the "Property"). Specifically, the Property is a place to which

*inter alia*

persons habitually go to commit crimes of possession of marijuana, unlawful possession of a firearm, aggravated robbery, and murder. The City has previously sued and obtained permanent injunction and judgment against Freddy Davenport concerning this Property under Chapter 125 of the Texas Civil Practice and Remedies Code for knowingly tolerating habitual criminal activity on the Property, not taking reasonable steps to abate the criminal activity, and maintaining the Property as a common nuisance. Currently, Defendants have failed to take reasonable steps to abate the habitual criminal activity on the Property that continues to this day.

**IT IS THEREFORE ORDERED** that Defendants, including their employees, servants, contractors, successors, assignees, and any persons in active concert of active participation with Defendants, are enjoined from maintaining the Property as a common nuisance, specifically, as a place to which persons go to commit crimes of possession of marijuana, unlawful possession of a firearm, aggravated robbery, and murder.

**IT IS FURTHER ORDERED** that Defendants shall immediately do the following to help abate the common nuisance at the Property:

    a. Hire a minimum of two certified peace officers to patrol the Property together, for 24 hours per day, seven days a week, during the pendency of this order;

    b. Limit the hours of operation of the car wash business to the time between 7:00a.m. and 9:00p.m. daily, install and maintain signage that states such hours of operation, and ensure the Property is not occupied outside of business hours;

    c. Limit the amount of time that any individual customer is permitted on the Property to one (1) hour;

    d. Maintain all security lighting;

TEMPORARY RESTRAINING ORDER      2

e.   Submit a criminal trespass affidavit to the City no later than 5:00p.m. on June 7, 2019, and require security officers to enforce criminal trespass law during business and non-business hours to prohibit anyone from loitering on the Property;

f.   Alternatively, in the event that Defendants close the business on the Property, Defendants are ordered to post and maintain barricades for all points of ingress and egress on the Property and are required to maintain security patrol on the Property on a regular basis to be sure that the Property is secured and not being trespassed upon.

**IT IS FURTHER ORDERED** that the clerk shall issue notice to Defendants of the hearing on the City's application for temporary injunction.   The purpose of this hearing shall be to determine whether this temporary restraining order along with any other possible measures should be made a temporary injunction pending full trial.

No bond is necessary to be posted by Plaintiff, the City of Dallas.

This order expires ~~on~~ _Pursuant To The Tx R. Civ. P_____ and the hearing on the City's application for temporary injunction is set for the __20__ day of ___June____, 2019 at ___1__ _P_.m. in the __14th_____ Court.

Signed on __6 2____, 2019 at __2  to_____ ~~a.m.~~/p.m.


_____
PRESIDING JUDGE