## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS - DALLAS DIVISION

| | | |
|---|---|---|
| JIM'S CAR WASH, FREDDY DAVENPORT, DALE DAVENPORT, | § § | |
| Plaintiffs, | § | CASE NO:    3:21-cv-1746 |
| | § | |
| v. | § | |
| | § | |
| CITY OF DALLAS, | § | |
| CHAD WEST, ADAM MEDRANO, CASEY | § | |
| THOMAS II, CAROLYN KING ARNOLD, | § | |
| JAIME RESENDEZ, OMAR NARVAEZ, | § | JURY TRIAL DEMANDED |
| ADAM BAZALDUA, TENNELL ATKINS, | § | |
| PAULA BLACKMON, ADAM MCGOUGH, | § | |
| LEE KLEINMAN, CARA MENDELSOHN, | § | |
| JENNIFER GATES, DAVID BLEWETT, in | § | |
| their official capacities as members of the | § | |
| Dallas City Council, DWAINE CARAWAY, | § | |
| ESTATE OF CAROLYN DAVIS, ESTATE | § | |
| OF LEO CHANEY, JR., JEREMY | § | |
| SCROGGINS, DIANE RAGSDALE, | § | |
| Defendants. | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT FOR INFRINGEMENT OF DUE PROCESS, TEMPORARY AND PERMANENT INJUNCTION

COME NOW, Plaintiffs Dale Davenport and Freddy Davenport, doing business as Jim's Car Wash (corporately, "Plaintiffs"), to complain of the unequal treatment to other commercial organizations, showing animus due to the Davenports' race, and deliberately acting to punish them for refusing to close or move their business from Martin Luther King Jr., Boulevard, in Dallas.

Individuals on the Dallas City Council misused their authority and targeted Jim's Car Wash for extinction, successfully using retroactive over-regulation designed to put it out of business under the guise of fighting crime. In so doing, Council members violated the Plaintiffs' rights.

Plaintiffs file this amended complaint to correct the status of Jim's Car Wash, and dismiss claims against all individuals, leaving only the City of Dallas.

## I.   PARTIES

### A.  Plaintiffs

1.      Plaintiff Jim's Car Wash is a self-serve car wash previously operating at 2702 Martin Luther King Jr. Blvd. in Dallas, Texas, operated as a general partnership by Freddy Davenport and his son, Dale Davenport.

2.      Plaintiff Freddy Davenport owned Jim's Car Wash and may be contacted through the undersigned.

3.      Plaintiff Dale Davenport was a co-owner of Jim's Car Wash and may be contacted through the undersigned. In the events described herein, references to "Davenport" will always be to Dale Davenport, who manages the car wash operations, unless otherwise specified.

### B.  Defendant

4.      Defendant City of Dallas is an incorporated city in the County of Dallas, Texas, which has appeared in this case.

## II.   JURISDICTION

5.      This Court has subject-matter jurisdiction over this suit because it arises under U.S. Const. Amend. XIV, § 1. "Nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

6.      This action is brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983, which provides redress to persons deprived of civil rights under color of state law, and under 28 U.S.C. § 1343(a)(3)(4) and § 1331. These provisions confer jurisdiction on this Court to adjudicate violations of federal civil rights acts and applicable provisions of the U.S. Constitution.

7.      The Court has authority to grant declaratory relief, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. Remedies are available under 42 U.S.C. § 1983.

8.      This Court has personal jurisdiction over the Defendants, who own property and run the business that is the subject of this suit in Dallas, where the events leading to this suit all occurred.

### III.    VENUE

9.      Venue is proper in this District under 28 U.S.C. § 1391(B)(2), because the events giving rise to this claim occurred in this District and because the subject property sits in this District.

10.     Venue also lies under 28 U.S.C. § 1400(a), because defendants reside or may be found in this District.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

### IV.    FACTS

**A. Members of the Dallas City Council targeted Jim's Car Wash for two decades.**

12.     Jim's Car Wash ("car wash") was a commercial car wash located at 2702 Martin Luther King, Jr., Blvd, a few blocks from Dallas Fair Park. Freddy Davenport purchased the property in 1993 and invested more than $250,000 in improvements to it. See Exhibit 1.

13.     Freddy operated the car wash with his son, Dale Davenport. See Exhibit 1.

14.     This part of Dallas is operated as a hotspot for local city council members and politically connected individuals who shake down business owners for donations, threatening to misuse police resources to eliminate those who refuse to participate in the graft. Since purchasing the car wash until the City forced its closure, the Davenports resisted full participation in the subtle and not-so-subtle suggestions to buy peace by paying off the politically connected. This resistance was met with allegations of criminal activity by council members who ignore significant illegal activity nearby. See the March 2006 "Report on Joint Interim Study Charge to the 80th Texas Legislature" by the Committee on Criminal Jurisprudence & General Investigating and Ethics Committee (Exhibit 2).

15.     In 2001, members of the city's nuisance abatement program SAFE (Support Abatement Forfeiture Enforcement) contacted the Davenports to inform them of recurring drug activity at the car wash. Freddy Davenport suggested that police conduct a sting operation on the property and offered to cooperate. Representatives of SAFE disregarded the suggestion. See Exhibit 1.

16.     In 2002, Davenport witnessed a Dallas Police Department officer using mace on a man in the car wash parking lot. The officer later falsely accused the man of resisting arrest.

17.     Davenport appeared as a witness of the event in the man's court hearing, testifying that the man had not resisted arrest. On the day following Davenport's testimony, a bullet was shot through the window of Davenport's home. The man accused of resisting arrest was eventually acquitted of the charge, thanks in part to Davenport's testimony. On the day of the acquittal, seventeen DPD vehicles and twenty-six officers blocked the driveway of the car wash, rendering it inaccessible to customers. The Dallas Police Department's Internal Affairs refused to take a report of the incident. See Exhibit 1 and Ex. 2, at 6.

18.     Dallas police Chief David Kunkle, also testifying under oath, confirmed Davenport's testimony regarding the gunshot to his residence. He told the Texas House Committee in Austin in April 2005 that the FBI informed him that they had investigated the case and found that someone had fired a shot through Davenport's house on the night in question. See Exhibit 1, Exhibit 2, at 6, and Jim Schutze, Kickback City, Dallas Observer, May 12, 2005.[1]

19.     In 2003, the City of Dallas filed for a Temporary Restraining Order against Jim's Car wash. The Injunction was later made permanent. Mr. Davenport attended an Accord meeting with city representatives where he was told that he needed to improve the safety and security of his property.

---

[1] https://www.dallasobserver.com/news/kickback-city-6381866

Davenport advanced the possibility of purchasing and installing cameras at the car wash to both monitor and deter any criminal activity on the property. See Exhibit 1.

20.     Dallas city representatives insisted that cameras would be insufficient and requested that he hire a guard service. Davenport hired two armed guards to patrol his property. Two weeks following the Accord meeting, Davenport was informed that the City was dissatisfied with his efforts and that the two guards were insufficient. See Exhibit 1.

21.     In 2004, the City of Dallas filed a Petition pursuant to Chapter 125 of the Texas Civil Practice and Remedies Code alleging that Jim's Car Wash was a magnet for crime in the area. On November 19, 2004, following an evidentiary hearing in which the City used Plaintiffs' own 911 calls for help against him, the Court entered a Permanent Injunction against Jim's Car Wash. The Permanent Injunction required in part that Jim's Car Wash install and maintain fencing around the property and hire security guards to patrol the property for a minimum of forty-two hours per week. See Exhibit 1.

22.     This treatment, which was inconsistent with the treatment of neighboring, similarly situated businesses, and the use of Plaintiffs' 911 calls as evidence against him ultimately became part of a larger investigation by the Texas State Legislature. The treatment of Plaintiffs by the City of Dallas before 2005 is not too far afield from the treatment it is experiencing now. See Exhibit 1.

23.     In October of 2005, as part of an investigation for the Texas State Legislature, a public hearing of testimony was held by a Joint Committee comprising the House Committee on Criminal Jurisprudence and the House General Investigating and Ethics Committee. Davenport and his attorney gave testimony at the hearing.

24.     In January of 2006, the Joint Committee submitted their Report to the Texas House of Representatives ("Report"). The conclusion can be summarized as reporting that the campaign

against Davenport had exposed ongoing city-wide shakedown efforts by Dallas City Hall. In the

report, the committees gave the following summary of the testimony they received from Davenport

and other Dallas business-owners:

> "Multiple witnesses testified before the committees and repeated the allegations made during the regular session concerning the City of Dallas: that the city has in many instances targeted honest businesses in a selective application of the nuisance statute; that the number of abatable offenses used against a property included activities instigated by the police themselves (i.e., undercover operations where criminals are solicited by police to come on the property or traffic stops that happen to occur in the same block as the business); and that property owners were directed to hire off-duty Dallas Police Department officers with the implication that doing so would help end their legal conflict with the city. The most troubling aspect for the committees was testimony about the continuation of these practices even after the effective date of H.B. 1690, which included legislative changes designed to curtail these types of abuses.
>
> …
>
> Underlying the repeated allegations heard by the committees is a recurrent theme of ward-based politics run amok as the selective enforcement of nuisance laws protect politically-connected insiders and punish their competitors. The committees heard allegations of undue political influence being used to benefit businesses and property owners who responded favorably to "suggestions" that they channel funds into an incumbent official's favored non-profit organization or that they hire security personnel from a company owned by another local elected official with powerful political ties."

See Exhibit 2, at 29.

25.     The March 2006, "Report on Joint Interim Study Charge to the 80th Texas Legislature" by

the Committee on Criminal Jurisprudence & General Investigating and Ethics Committee states

that Andy Segal, an attorney with the South Dallas Business Association, informed Davenport that

then-Councilman Chaney was displeased "with his commitments to the community" and advised

Davenport to donate to the African American Book Fair, a project of Chaney's. Davenport

complied, donating $500 to the Fair. Exhibit 1.

26.     According to the report, in 2005 Davenport approached Councilman Chaney about the

injunction on his business and Councilman Chaney suggested in response that Davenport hire

Nation of Islam or JL Security (the latter owned by Councilman Fantroy) for his security service needs. See Exhibit 1.

27.     Sixty percent of Davenport's revenue was spent on guard service required by the SAFE Team. As part of the injunction placed against his business, he was required to comply with all provisions of the judge's order for one year. See Exhibit 1 and Exhibit 2, at 9.

28.     In 2013, Davenport received a letter threatening the use of eminent domain to seize the car wash property. The letter stated, "As you are probably aware, the City of Dallas is planning improvements to Martin Luther King, Jr. Boulevard and median. Plans have progressed to the point that we wish to advise you that your property described above will be needed for the project." He consulted Lou Jones, the city employee who signed the letter, and could never definitively determine who had authorized the letter. See Exhibit 1.

29.     Also, in 2013, Davenport spoke to the same Ms. Jones about a property that bordered his own. Davenport asked about the possibility of purchasing the property, which was vacant, and was told by Ms. Jones that the city would not sell it to "people like you." See Exhibit 2.

30.     Over the years, Davenport has cooperated with police at every opportunity, even installing video surveillance to which the police have access. See Exhibit 1.

31.     The Council created, then surreptitiously amended PD 595 to eliminate the car wash.

32.     In 2001, the Dallas City Council created Planned Development District 595, also known as the South Dallas/Fair Park Special Purpose District ("PD 595").

33.     Jim's Car Wash was located in an area that was zoned to be a Community Commercial ("CC") sub-district, and as described at Article 595, Sec. 51P-595.113, car washes were allowed, with the caveat that a "Site Plan Review" is required before any new work permit may be issued, in accordance with zoning regulation 51A-4.800. Development Impact Review.

34.     This zoning change meant that the car wash could continue to exist as it was, but would be required to obtain additional approval  from the zoning director before making any changes that required a work permit; the director could, under this process, force Davenport to provide a site plan that would "contain any other reasonable and pertinent information that the director determines to be necessary for site plan review" under Dallas Ordinance § 51A-4.803(D)(1)(R). See Exhibits 1 and 3.

35.     PD 595 was created in part to make funds available for security and authorized a special tax on property owners within its boundaries to improve the area. Davenport has paid the Public Development District tax for years. See Exhibits 1 and 3.

36.     Because the car wash was spending more on anti-crime measures than others in PD 595, Davenport requested assistance with the expense, as is common for such funds. See Exhibit 1.

37.     Davenport was surprised to learn that no money was available for any tax-paying stakeholder because the funds were being used on a contracting entity, Hip Hop Government, Inc., operated by Jeremy "Jay" Scroggins. See Exhibit 1.

38.     Although the State of Texas determined that there were grounds for forfeiture and gave notice of such forfeiture on January 26, 2018, Plaintiffs believe that Hip Hop Government, Inc. lost its charter because its Certificate of Formation stated it was a non-profit entity, though the corporation was never granted such status. (Scroggins filed an amendment to his Certificate of Formation in 2013 that changed its purpose from "voting drive organizers" to charitable purposes.) See Exhibit 4.

39.     Plaintiffs note that the last public information report filed by Mr. Scroggins was in July 2014, though organizations are generally required to file such a report annually. Thus, although the Public Development District received more than $100,000 in its account in 2017, there was no

money available for Davenport, or for anyone else, due to the funds paid to Scroggins and non-entity Hip Hop Government, Inc. which apparently understood its job was to pay Scroggins and little else. See Exhibit 1. Scroggins's actions damaged Plaintiffs by dispensing money discriminatorily.

40.     Many businesses still existing and surrounding Jim's Car Wash received grant money from Dallas while Jim's Car Wash did not.

41.     As a business owner on MLK Boulevard, Davenport discovered through conversations with other owners that each was receiving money from the City for façade remodels. For example, Davenport learned the Emerald City/Blackjack Pizza building received $20,000.00 for a new facade. Freedom Fashion, a business on the other side of the car wash, received more than $20,000. Many other businesses also received grant money to make improvements. When Davenport called economic development inquiring about grant money for his car wash, Dallas personnel stated they were unable to find his address to which they could send an application, though they had no difficulty sending other, less helpful letters, such as those threatening eminent domain. See Exhibit 1.

42.     In 2012, the City Council of Dallas amended PD 595. The agenda for the December 12, 2012, council meeting annotated to summarize its discussion included this description:

68.    A public hearing to receive comments regarding a City Plan Commission authorized hearing to consider amendments to Planned Development District 595, the South Dallas/Fair Park Special Purpose District, amending the standards for certain uses, considering appropriate zoning on certain parcels currently zoned for multifamily and non-residential uses, adding a new single family district classification and new mixed use form district classifications on property zoned Planned Development District No. 595 and an NS(A) Neighborhood Service District generally bound by the Union Pacific (DART) Railroad, the Southern Pacific Railroad, C.F. Hawn Freeway, the D.P.&L. Company easement, Central Expressway (S.M. Wright Freeway), the Southern Pacific Railroad, the Santa Fe Railroad, R.L. Thornton Freeway, 2nd Avenue, Parry Avenue, Robert B. Cullum Boulevard, Fitzhugh Avenue, Gaisford Street, and the common line between City Blocks 1820 and D/1821; an ordinance granting amendments to Planned Development District No. 595; an ordinance granting a change of zoning from an MF-2(A) Multifamily subdistrict, an NC Neighborhood Commercial subdistrict and a CC Community Commercial subdistrict to an FWMU-3 Form Walkable Mixed Use subdistrict on property generally bounded by Good Latimer Expressway, Julius Schepps Freeway (I-45), Pennsylvania Avenue, Lamar Boulevard and Grand Avenue with a SF Shop Front overlay on properties fronting Martin Luther King Boulevard and Lamar Street and certain properties fronting Ervay Street and Colonial Avenue, granting a change of zoning from an RS-I Regional Service Industrial subdistrict to an FWMU-3 Form Walkable Mixed Use subdistrict on property on the south corner of Coombs Street and Harwood Street, and granting a change of zoning from an MF-2(A) Multifamily subdistrict to an FWMU-3 Walkable Mixed Use subdistrict on property located on the northeast corner of the S.M. Wright Freeway (US-175) and Hatcher Street; and an ordinance granting a change in zoning from an NS(A) Neighborhood Service District to an NC Neighborhood Commercial subdistrict within Planned Development No. 595 on properties located on the west and south corners of Spring Avenue and Foreman Street
Recommendation of Staff and CPC:  Approval
Z101-277(CG)
**[12-3031;   HEARING   CLOSED;   CPC   RECOMMENDATION   FOLLOWED; ORDINANCES 28860, 28861 AND 28862]**

43.    As indicated by the annotated agenda section copied above, the members of the Dallas City Council approved the proposed changes reflected in Ordinances 28660, 28861, and 28862. During this time, the minutes of the meeting reflect that Councilmember Carolyn Davis had a conflict of interest and left the council chambers during the discussion of this proposal.

44.    The effective change to the zoning rules that occurred in the above resolutions eliminated car washes as an allowed business in PD 595, though no document on the agenda hinted at this change. Jim's Car Wash became a non-conforming use under the Dallas zoning laws, though Davenport was not provided any substantive notice. See Exhibit 1.

45.    In mid-2018, while Dallas was struggling with its budget, the Dallas police offered overtime to officers to patrol Jim's Car Wash on May 28, 2018. The email distributed to the police force states: "Southeast Patrol Division has City Overtime or Compensation Time available for all

ranks on Monday, May 28, 2018. The hours are from 2 p.m.–10 p.m. Overtime will cover South Dallas (Rochester Park and the MLK car wash)." See Exhibit 1 and Exhibit 5.

46.     Despite supportive public statements by leaders of the Dallas Police Association and police officers who patrol the area surrounding Jim's Car Wash that the Davenports have worked with the police to fulfill the promises and expectations they expect of a business owner, members of the Dallas City Council signed a request for the Dallas City Council to enforce the regulations of PD 595 on the car wash, meaning it would have to close. See Exhibit 1.

47.     In 2018, Davenport was told by a third-party that his car wash was a nonconforming use under the zoning laws, but he could not determine how or when the zoning rules had been changed until he hired counsel. See Exhibit 1.

48.     On October 12, 2018, the Dallas City Council published its agenda for its October 24, 2018, meeting. Agenda item No. 57, proposed by the "Mayor and City Council's Office" suggested as follows:

> "A resolution requesting the Board of Adjustment to authorize compliance proceedings for Jim's Car Wash located at 2702 Martin Luther King, Jr. Boulevard, Dallas, Texas - Financing: No cost consideration to the City (via Council Members Felder, Clayton, Griggs, Thomas, Narvaez)"

Exhibit. 6, at No. 57.

49.     On October 24, 2018, the Dallas City Council approved item No. 57 in a 12-2 vote to send the public nuisance question to the Board of Adjustment, with only Sandy Greyson and Philip Kingston refusing to participate in the charade. Exhibit. 6, at Item 57.

50.     Mayor Rawlings and Councilmember Felder specifically targeted the car wash, making remarks that the carwash "had to go" cavalierly alleging drug use on the property as though drug use as a circumstance connected to the car wash occurred more than at any of the nearby, similarly situated businesses. See Exhibit 1.

51.     In 2018, while former Dallas City Council Member Carolyn Davis was at Blackjack Pizza speaking to its owner about new plans for MLK Blvd, Davenport overheard her say, "We're going to get rid of that cracker head" while talking about plans for the car wash property. When she was told, "The owner of the car wash is standing behind you," she covered her face and ran out of the building. Davenport followed and tried to speak to her, but she got into her car and drove off. In 2019, Ms.  Davis pled guilty to charges made in federal court in cause number 3:19-cr-83-S for taking bribes related to developers. Exhibit 1.

52.     This suit seeks to enjoin the Dallas City Council's consistent harassment of the car wash and its owners, bring light to the corruption and squandering of taxpayer funds to the benefit of Councilmembers and their friends, who are doing nothing to earn such funds and address violations by the Defendants of Plaintiffs' rights under the United States and Texas Constitutions. The actions of the members of Dallas City Council are nothing less than an ongoing effort to create a segregated commercial area, excluding white small business owners.

**B. June 14, 2019, Temporary Restraining Order**

53.     From the beginning of 2019 to the end of July 2019, there was about 100 murders in Dallas, Texas. One of those deaths occurred at Jim's Car Wash on June 2, 2019. See Exhibit 1.

54.     Following said homicide, the City of Dallas devoted even more resources to pursue the forced unlawful closure of Davenport's business. See Exhibit 1.

55.     On June 5, 2019, the City of Dallas filed its Original Petition seeking a Temporary Restraining Order and Temporary and Permanent Injunction against Jim's Car Wash, preventing the Davenports from operating their business.

56.     The Defendants requested and were given a hearing on their Application for Temporary Restraining Order and gave Plaintiffs only about one-hours' notice of said hearing.  Exhibit 1 and Exhibit 7

57.     Following the hearing on Defendants' Application for Temporary Restraining Order, the Honorable Judge Eric Moyé granted Defendants' Application and issued said Order, in effect closing Jim's Car Wash.  The Order states in part:

> It clearly appears from the facts set forth in the City's Petition that Defendants are knowingly tolerating and maintaining a common nuisance as defined in Chapter 125 of the Texas Civil Practice and Remedies Code at the real property located at Block 21/1290 and commonly known as 2702 Martin Luther King Jr. Blvd., Dallas, Texas upon which is a self-service car wash facility named Jim's Car Wash (the "Property").  Specifically, the Property is a place to which *inter alia* persons habitually go to commit crimes of possession of marijuana, unlawful possession of a firearm, aggravated robbery, and murder.  The City has previously sued and obtained permanent injunction and judgment against Freddy Davenport concerning this Property under Chapter 125 of the Texas Civil Practice and Remedies Code for knowingly tolerating habitual criminal activity on the Property, not taking reasonable steps to abate the criminal activity, and maintaining the Property as a common nuisance.  Currently, Defendants have failed to take reasonable steps to abate the habitual criminal activity on the Property that continues to this day.

See Exhibit 1 and Exhibit 8.

58.     In the Dallas Police Department Crime Map, there have been multiple instances of homicides occurring in the geographical area around Jim's Car Wash.  However, despite the area being generally crime ridden, Jim's Car Wash was singled out by Defendants for closure.

59.     The following depicts the crime map published by the City of Dallas:



60.     The depiction, provided by the City of Dallas, shows a multitude of criminal offenses in and around this geographic area of the City of Dallas.  Further, the depiction shows that the offenses are not limited to the specific area around Jim's Car Wash, as shown by the waypoint in the map's middle.  Nevertheless, Defendants continued to target and finally close the car wash through many means all in violation of Plaintiffs' state and federal constitutional rights.

61.     All defendants cooperated with the ongoing actions to give benefits to certain favored businesses and deny assistance to Jim's Car Wash based on corruption that was based on bribery and a desire to prevent the financial success of Jim's Car Wash because its owners were the wrong color, and because they failed to pay for various campaigns and did not hire the favored security companies which were connected to city council members.

### V.     CLAIM – VIOLATION OF DUE PROCESS (42 USC § 1983)

**A.     Legal Standard**

62.     To prove a claim for violation of due process under § 1983, a plaintiff must identify a protected life, liberty or property interest and then prove that governmental action resulted in a deprivation of that interest. *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010).

63.     Although municipal zoning decisions may normally be upheld when there is any "conceivable rational basis" for the decision, no such deference is afforded when there is "invidious discrimination, suspect classifying criteria, or infringement of fundamental interests." *Shelton v. City of Coll. Station*, 780 F.2d 475, 477 (5th Cir. 1986).

64.     Similarly, state law provides that courts may interfere with zoning ordinances that represent "a clear abuse of municipal discretion" or when the decision is "arbitrary either generally or as to particular property." *City of Univ. Park v. Benners*, 485 S.W.2d 773, 778 (Tex. 1972), abrogated on other grounds by *Bd. of Adjustment of City of San Antonio v. Wende*, 92 S.W.3d 424 (Tex. 2002).

**B.    Application**

65.     The above facts and laws are incorporated by reference in all claims.

66.     Here, Plaintiffs have a protected property interest in the car wash. They have invested time and money into their business, expecting to be able to receive a return on their investment. The City's actions have resulted in the deprivation of Plaintiffs' investment-backed interest in the property at issue.

67.     Defendants' actions should not be reviewed under a rational-basis standard because defendants have engaged in conduct that singles out Plaintiffs on account of their race and refusal to cooperate in various schemes to make unlawful payments to elected officials, in violation of Plaintiffs' Fourteenth Amendment rights.

68.     The Defendants' decision to exclude car washes as a permissible use under the zoning ordinance was no accident. Defendants have been seeking to shut down Plaintiffs' business for years, due to their refusal to participate in the city's system of corruption, and as retaliation for testifying against Defendants before the state legislature.

69.     Defendants are attempting to apply laws and use the judicial system against Plaintiffs in a manner that is inconsistent with their treatment of the businesses in the surrounding area.

70.     Further, discrimination that violates the Due Process Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI of the Civil Rights Act of 1964.

## VI.     CLAIM – VIOLATION OF EQUAL PROTECTION (42 USC § 1983)

### A.     Legal Standard

71.      A plaintiff may bring an equal protection claim as a "class of one" when he has been (1) intentionally treated differently from others similarly situated and (2) there was no rational basis for the difference in treatment. *Lindquist v. City of Pasadena Tex.*, 669 F.3d 225, 233 (5th Cir. 2012) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

### B.     Application

72.     The above facts and laws are incorporated by reference in all claims. Plaintiffs' federal claims are brought pursuant to 42 U.S.C.§ 1983 and the Equal Protection Clause of the Fourteenth Amendment.

73.     Defendants' actions are part of an ongoing, intentional attempt to maintain a racially segregated commercial district in violation of Plaintiffs' Fourteenth Amendment rights to equal protection. Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI of the Civil Rights Act of 1964.

74.     Defendants have engaged in conduct which singles out Plaintiffs because of their race, refusal to cooperate in various schemes to make unlawful payments to elected officials, and as retaliation for testifying against Defendants to the state legislature. Moreover, as stated above, Defendants have attempted and are currently attempting to apply laws and use the judicial system

against Plaintiffs in a manner that is inconsistent with their treatment of the businesses in the surrounding area and their owners and is based on the race of Dale Davenport and Freddy Davenport.

### VII.    CLAIM – ILLEGAL TAKING (42 USC § 1983)

75.    Defendants' actions as described above also violate Plaintiffs' right to be free of government takings as provided by the Fifth Amendment, which stipulates that "[n]o person shall be … deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. XIV. § 2.

76.    Federal law at 42 USC §§ 1983, et. seq. provides recourse to citizens when governments violate the above-described rights, providing injunctive relief as a remedy to cease such actions, and fees under § 1988, for which Plaintiffs plead.

77.    Defendants interfered with Plaintiffs' investment-backed expectations in the car wash when they acted with discriminatory intent to deprive him of his property use through rezoning.

### VIII.    CLAIM – CONSPIRACY TO DEPRIVE CIVIL RIGHTS (42 USC § 1985)

78.    All of the named defendants acted to support the City's ongoing discrimination of Plaintiffs, seeking to deprive them of the equal opportunity to operate a business, defaming Jim's Car Wash in the public, blaming it for crime that is actually caused by deliberate decisions to deny police presence except to create a narrative of criminality.

79.    The result of the defendant's actions is that the City deprived Jim's Car Wash of its legal ability to operate and used police action to force its closure, and the attendant financial loss.

### IX.    APPLICATION FOR INTERLOCUTORY AND PERMANENT INJUNCTION

80.    The plaintiffs ask the Court to set their application for temporary injunction for a hearing and issue a temporary injunction against Defendants order them to allow the Carwash to reopen.

81.    The plaintiffs have joined all indispensable parties.

82.     There is no adequate remedy at law that will give the Plaintiffs full relief because civil and criminal penalties, loss of income, and damaged business relationships should be addressed immediately. Each day, the Plaintiff suffers significant irreparable damage to his constitutional rights to due process of law, equal protection, and to conduct lawful business as well as suffering actual damages to its business operations. Plaintiffs' total damages cannot be measured with certainty, and it is neither equitable nor conscionable to allow Defendants to violate Plaintiffs' constitutional rights.

83.     The loss of constitutional freedoms for "even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

84.     The harm to the Plaintiff, if this requested injunction is denied, will be significant and irreparable. If this Court allows the City of Dallas and its current council members to continue unchecked, Plaintiffs face the total loss of their business for no other reason than an illegal and unconstitutional regulatory action. *See Lifeguard Benefit Servs., Inc. v. Direct Med. Network Solutions, Inc.*, 308 S.W.3d 102, 111 (Tex. App.—Fort Worth 2010, no pet.).

85.     Plaintiffs are entitled to an injunction because Defendants can show no harm to the City of Dallas or its city council members in granting the relief requested. Defendants violated the legal process and the U.S. Constitution in their application of the nuisance property ordinances. Enjoining an illegal and unconstitutional regulatory action causes no harm to Defendants.

86.     Therefore, pursuant to Fed. R. Civ. P. 65(a), Plaintiff respectfully requests that this Court issue a temporary injunction against the City of Dallas and current city council members, restraining them, their agents, representatives, employees or anyone acting on their behalf, including Dallas Police Department officers, until further order of the Court, and from taking any actions to enforce any injunction on Plaintiffs' business, including but not limited to a) preventing

Plaintiffs from operating their business, and; b) designating Plaintiffs' business as a habitual criminal property until the Court can hold a hearing on an interlocutory injunction, and a trial on the merits. (The proposed temporary injunction will be filed after all parties are served.)

87.     The Court should note it is not necessary at the hearing for temporary injunction for Plaintiffs to prove they will ultimately prevail, *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968), but only that Plaintiffs are entitled to the preservation of the status quo pending trial. *Iranian Muslim Org. v. City of San Antonio*, 615 S.W.2d 202, 208 (Tex. 1981).

88.     The comparative injury or balance of equities and hardships to the parties and to the public interest support granting injunctive relief because the Plaintiff is only asking the Court to preserve the status quo and require Defendants to cease unlawfully infringing upon Plaintiffs' rights injunctive relief.

89.     After adjudication on the merits, Plaintiffs seek that this Court issue a permanent injunction against the City of Dallas and its current city council members, restraining them or anyone acting on their behalf, including Dallas Police Department Officers, from enforcing any current injunction against Plaintiffs, including but not limited to: a) preventing Plaintiff from operating its business, and; b) suspending Plaintiffs' licenses and instituting any enforcement actions against Plaintiff based in any way upon TEX. ALCO. BEV. CODE § 11.614.

90.     Absent judicial intervention, Plaintiff faces ongoing requirements impacting its operation and no practical ability to again prevent the City of Dallas and the current Dallas city council from further penalizing the Plaintiffs and forcing the permanent closure of Plaintiffs' business.

91.     There is no adequate remedy at law that will give the Plaintiff relief because civil and criminal penalties, loss of income, and damaged business relationships should be addressed

immediately. Plaintiffs' total damages cannot be measured with certainty, and it is neither equitable nor conscionable to allow Defendants to violate Plaintiffs' constitutional rights.

92.    The Court should note it is not necessary at the hearing for temporary injunction for Plaintiffs to prove they will ultimately prevail, *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968), but only that Plaintiffs are entitled to the preservation of the status quo pending trial. *Iranian Muslim Org. v. City of San Antonio*, 615 S.W.2d 202, 208 (Tex. 1981).

93.    The comparative injury or balance of equities and hardships to the parties and to the public interest support granting injunctive relief because the Plaintiff is only asking the Court to preserve the status quo and require Defendants to cease unlawfully infringing upon Plaintiffs' constitutional rights with a temporary and then permanent injunction.

## X.    PRAYER

94.    Plaintiffs pray this Court cite Defendants to appear and answer, and, on final trial or at preliminary hearing, that the plaintiffs be awarded a judgment against Defendants for the following, along with any other relief to which Plaintiffs are entitled:

a)  Temporary injunction and permanent injunction to prevent defendants from acting to force Jim's Car Wash to operate something other than a car wash;

b)  Damages for failure to provide due process, equal protection, and regulatory takings;

c)  Declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, declaring that Defendants do not have the lawful ability to burden or cease Plaintiffs' operation of Jim's Car Wash under the present circumstances;

d)  Conspiracy for the deprivation of constitutional rights;

e)  Reasonable attorney fees;

f)  Court costs.

Respectfully submitted on October 22, 2021,

> Warren V. Norred
> *s/Warren V. Norred/*
> Texas Bar No. 24045094
> Norred Law, PLLC
> 515 East Border Street; Arlington, TX 76010
> Tel. (817) 704-3984
> wnorred@norredlaw.com

**APPENDIX:**
EXHIBIT 1 – Declaration of Dale Davenport
EXHIBIT 2 – Report on Joint Interim Study Charge to the 80th Texas Legislature
EXHIBIT 3 – South Dallas/Fair Park Public Improvement District Service Plan Budget
EXHIBIT 4 – Organization Documents about Hip Hop Government Inc.
EXHIBIT 5 – 2018 Southeast Patrol Division Email
EXHIBIT 6 – Dallas City Council Agenda for October 24, 2018, Meeting
EXHIBIT 7 – Notice of Hearing for Temporary Injunction
EXHIBIT 8 – Temporary Restraining Order